HAROLD·L. PRESTON v. UNION PACIFIC RAILROAD COMPANY, Appellant.

Division One, March 14, 1922.

1. **NEGLIGENCE: Humanitarian Doctrine: Demurrer to Evidence: Time to Avert Injury.** In a personal injury case, submitted on the humanitarian doctrine, a demurrer to the evidence was properly overruled where there was ample evidence that plaintiff, a switchman, was seen in a position of danger in time to have warned him and to have stopped the train and saved him.

2. ———: ———: ———: **Custom to Warn.** The rule that switchmen are expected to look out for themselves was modified by the custom to warn which was pleaded and proved in this case and was not applicable to this case, where cars were propelled towards plaintiff by one switching crew after an agreement by its foreman, to notify plaintiff, a switchman of another crew, who was upon his knees beside the rail engaged in picking ice out of switch points and was seen in a position of peril and oblivious of danger and no warning was given nor cars checked or stopped.

3. ———: ———: ———: **Ability to Hear Warning.** Whether plaintiff could have heard a warning of danger from approaching cars, had one been given, was a question of fact for the jury under the evidence.

4. ———: ———: ———: **Assumption of Risk.** Even under the Federal rule as to assumption of risk, which was applicable to this case, the plaintiff, a railroad switchman, did not as a matter of law, assume the risk of having cars driven upon him without warning after he was discovered in a position of peril and condition of obliviousness to his danger, and the question of assumption of risk was properly submitted to the jury.

5. ———: ———: **Instructions: Length.** Where a case required the predication of numerous facts before a verdict for plaintiff would be authorized, it was not a valid objection to an instruction that it was long.

6. ———: ———: ———: **Ability to Hear Warning.** An instruction for plaintiff, a railroad switchman, who was injured by being struck by cars propelled against him, which required the jury before finding for him, to find the duty to warn him, the opportunity to warn him, the failure to warn, and then that this was negligent and that his injury was a direct result of such negligence, covered the issue whether he could have heard a warning had one been given.

7. ———: ———: ———: **Assuming Facts in Issue.** An instruction which assumes the truth of controverted testimony as to the facts in issue is properly refused.

8. ———: ———: ———: **Contributory Negligence.** Under the humanitarian doctrine upon which this case was submitted, the negligence of plaintiff, if any, in taking a position so near the rail that he might be struck by a passing car, was not any part of the efficient cause of his injury if he was, as the jury found, seen in peril, of which it was apparent he was oblivious, in time for an effective warning to have been given or the train stopped, and therefore it could neither defeat his action under the state law nor entitle defendant, as a matter of law, to a reduction of damages under the Federal Employers' Liability Act.

9. ———: **Weight of Evidence.** Where the testimony of plaintiff in a personal injury suit is not so in conflict with physical conditions or laws of nature that it must be rejected for that reason, its weight is for the trial court, which alone has the right to grant a new trial on the weight of the evidence.

10. ———: **Trial: Conduct of Counsel.** Where counsel for plaintiff in a personal injury suit asked a witness for defendant a question which implied that the witness was attempting to shield defendant and the court sustained an objection to such question, it was not error for the court to decline to reprimand counsel, in view of the fact that the question came after a series of evasive

answers by the witness. Nor was there error in refusing to discharge the jury after an exception was taken to a remark of counsel which was withdrawn.

11. ———: Amount of Judgment. A judgment for $10,000 entered on a verdict for $15,000 after a *remittitur* of $5000 required by the trial court, in a personal injury suit, is not excessive, where plaintiff, a railroad switchman, who was in his early thirties, was incapacitated for further service in his occupation, and his earning capacity had been reduced $22 per month, and he had incurred medical bills to the amount of $200 and had lost earnings up to the trial amounting to $1000 and had received severe and permanent injuries and was greatly disfigured about the face, besides having undergone great pain and suffering.

12. ———: Railroad Companies: Federal Control. Under the Act of Congress of August 29, 1916, Chapter 418 (39 U. S. Stat. at L. 645) and the proclamation of the President of December 26, 1917, of which the courts take judicial notice, the railroad of the Union Pacific Railroad Company, named as defendant in this suit, was exclusively in the control and possession of the Director General of Railroads on December 30, 1917, the date of the injury involved in this suit, such control and possession dating from 12 o'clock noon of December 28, 1917. Therefore, said Union Pacific Railroad Company, as such, was not in any way liable for damages for injuries resulting from the negligence of employees operating said railroad on December 30, 1917.

13. ———: ———: ———: Naming Railroad Company as Defendant. This suit for an injury to a railroad switchman received by reason of the negligence of other railroad employees on December 30, 1917, while such railroad was under Federal control, was begun on February 5, 1918, and the Union Pacific Railroad Company was named as defendant and service was had upon the employees of the Director General of Railroads, as formerly upon employees of the railroad company. An answer was filed by counsel in the name of the railroad company and the trial was begun and partly heard before any question was raised as to the propriety of the procedure. Thereupon counsel for plaintiff offered to substitute the Director General as defendant, but counsel for defendant declined to consent thereto. The trial proceeded to verdict and judgment for plaintiff and appeal to the Supreme Court. *Held*, that under the Act of Congress of August 29, 1916, Chapter 418 (39 U. S. Stat. at L. 645), and the President's proclamation of December 26, 1917, and the Act of Congress of March 21, 1918, Chapter 25 (40 U. S. Stat. at L. 451), and Order No. 50 of the Director General and Section 206 of the Transportation Act of 1920 (41 U. S. Stat. at L.

462), the Federal agent appointed by the President would be sub-
stituted as defendant and appellant in the Supreme Court, and be
ordered to be so substituted on motion in the circuit court and
judgment affirmed.

Appeal from Jackson Circuit Court.—*Hon. William O.
Thomas*, Judge.

AFFIRMED.

*R. W. Blair* and *Watson, Gage & Ess* for appellant.

(1)   The court erred in overruling defendant's de-
murrer interposed at the close of plaintiff's evidence,
and renewed at the close of all the evidence.   First.   Be-
cause the properties of the Union Pacific Railroad Com-
pany were, at the time of the injury, December 30, 1917,
under the exclusive control of the United States Govern-
ment, and were being operated, on December 30, 1917,
by the director general of railroads and not by the
Union Pacific Railroad Company.   Railroad v. North
Dakota, 250 U. S. 135; Railroad v. Caldwell, 264 Fed.
947; Krichman v. United States, 263 Fed. 543; Act of
Congress, Aug. 29, 1916, 39 Stat. 645 (Comp. St. 1974a);
Haubert v. Railroad, 259 Fed. 361; Mardis v. Hines, 258
Fed. 945; Foster v. Tel. Co., 219 S. W. 107; Cravens v.
Hines, 218 S. W. 912; Rutherford v. Railroad, 254 Fed.
880; Armstrong v. United States, 13 Wall. 154.   Second.
Because there was no evidence:   (a)  That defendant saw
plaintiff in a position of peril in time thereafter, by the
exercise of ordinary care and by the use of the means
at hand, to have warned him, and thereby averted the
accident.   (2)   The court erred in refusing to give de-
fendant's demurrer to the evidence, because, under the
Federal Employers' Liability Act, plaintiff assumed risk
of injury, under the undisputed evidence in this case, as
a matter of law; and, by submitting that question to the
jury for its consideration defendant was deprived of
rights guaranteed it by said act, and obligations and
burdens inconsistent with, and not imposed by, said act,

were thereby imposed on defendant. Seaboard Air Line v. Horton, 233 U. S. 503; Jacobs v. Railroad, 241 U. S. 229; Railroad v. Ward, 40 Sup. Ct. Rep. 275; Railroad v. Proffitt, 241 U. S. 462; Ry. Co. v. De Atley, 241 U. S. 313; Erie Rd. Co. v. Purucker, 244 U. S. 320. (3) The court erred, in giving plaintiff's instructions numbered 1 and 2, over the objection and exception of defendant. Gunn v. Hemphill Lbr. Co., 218 S. W. 982. (b) That defendant saw plaintiff in a position of peril in time thereafter, by the exercise of ordinary care and by the use of the means at hand, to have stopped the cars and averted the accident. (c) That defendant saw plaintiff oblivious to his peril in time thereafter, by the exercise of ordinary care and by the use of the means at hand, to have warned plaintiff or stopped the cars, and thereby have averted the accident. State ex rel. Lusk v. Ellison, 271 Mo. 463; Degonia v. Railroad, 224 Mo. 596; Rashall v. Railroad, 249 Mo. 510; Cahill v. Railroad, 205 Mo. 408; Evans v. Railroad, 178 Mo. 517; Aerkfetz v. Humphreys, 145 U. S. 419; Davis v. Railroad, 159 Mo. 67; Gaval v. Railroad, 251 Mo. 267; Keele v. Railroad, 258 Mo. 62; Eppstein v. Railroad, 197 Mo. 723; Pope v. Railroad, 242 Mo. 240; Barnard v. Met. St. Ry. Co., 137 Mo. App. 691. Third. Because plaintiff's own testimony shows conclusively that he could not have heard a warning if it had been given when the cars were more than fifteen to eighteen feet away from him; and therefore, such negligence, if any, was not the proximate cause of the injury. Rollison v. Wabash, 252 Mo. 539; Henze v. Railroad, 71 Mo. 636; Shaw v. Railroad, 104 Mo. 656; Sanders v. Railroad, 147 Mo. 424; Armstrong v. Railroad, 195 Mo. App. 86; Rashall v. Railroad, 249 Mo. 509. (4) The court erred in refusing to give instructions numbered ten and thirteen, requested by defendant. Simms v. Dunham, 203 S. W. 652; Degonia v. Railroad, 224 Mo. 589; McElwain v. Dunham, 221 S. W. 773; Gabal v. Railroad, 251 Mo. 268; Clark v. Railroad, 242 Mo. 606; Epstein v. Railroad, 197 Mo. 729; Degonia v. Railroad, 224 Mo. 587; State ex rel.

Peters v. Reynolds, 214 S. W. 121; Clancy v. Railroad, 192 Mo. 615; Brackschmidt v. Railroad, 205 Mo. 443. (5) The court erred in submitting the question of plaintiff's negligence to the jury for their consideration, because under the undisputed evidence in the case, plaintiff was guilty of contributory negligence as a matter of law; and the court thereby deprived defendant of rights guaranteed it by the Federal Employers' Liability Act, and imposed obligations and burdens not imposed by, and inconsistent with, said act. (6) The court erred in overruling defendant's motion for a new trial, for the reason that plaintiff's testimony was so contradictory, so highly improbable and so at war with the conceded facts of the occurrence that it should be rejected as too unsubstantial to raise any question of fact for the jury. Spohn v. Mo. Pac. Co., 87 Mo. 74; Lehnick v. St. Ry. Co., 118 Mo. App. 611; Comm. Co. v. Aaron, 145 Mo. App. 316; Steele v. Railroad, 265 Mo. 116; Scroggins v. Met. St. Ry. Co., 138 Mo. App. 215; Nolan v. Railroad, 250 Mo. 621; Daniels v. Railroad, 177 Mo. App. 280; Guffy v. Harvey, 179 S. W. 729; Schaub v. Ry. Co., 133 Mo. App. 448; Stafford v. Adams, 113 Mo. App. 121; Sexton v. Ry. Co., 245 Mo. 272; Weltmer v. Bishop, 171 Mo. 116; Payne v. Ry. Co., 136 Mo. 575; Nugent v. Milling Co., 131 Mo. 252; Lange v. Railroad, 151 Mo. App. 505. (7) The court erred in permitting counsel for plaintiff to make improper and prejudicial remarks during the trial and in his argument to the jury, and in refusing to reprimand counsel and discharge the jury on motion of defendant. Barnes v. St. Joseph, 129 Mo. App. 545; Haynes v. Trenton, 108 Mo. 133; Cameron v. Cameron, 162 Mo. App. 115; Pledge v. Griffith, 199 Mo. App. 316; Haake v. Milling Co., 168 Mo. App. 180; Kinney v. St. Ry. Co., 261 Mo. 116; Gibson v. Zeibig, 24 Mo. App. 65. (8) The court erred in refusing to sustain defendant's motion for a new trial, because the verdict is so grossly excessive under all the evidence in the case, that it cannot be reconciled with honest motives, and can only be accounted for on the grounds of passion, prejudice or mis-

conduct of the jury. Applegate v. Railroad, 252 Mo. 173; Lessenden v. Railroad, 238 Mo. 247; Farrar v. Railroad, 249 Mo. 211; Gibney v. Transit Co., 204 Mo. 704; Patterson v. Traction Co., 178 Mo. 273; Harper v. Railroad, 186 Mo. App. 308; Hutchinson v. Safety Gate Co., 247 Mo. 100.

*Atwood, Wickersham, Hill & Popham* for respondent.

(1) Affidavit for appeal is fatally defective in that the statute requires it shall state the appellant is "aggrieved" by the judgment and decision of the court in the case; whereas, this affidavit merely states appellant is "injured" etc. Appeals are statutory. No right therefor existing at common law and the statute must be strictly construed. R. S. 1909, sec. 2040; Owens v. Mathews, 216 Mo. 709; Railroad v. Powell, 104 Mo. App. 367; Walser v. Leach, 190 S. W. 932; Thomas v. Ins. Co., 89 Mo. App. 12; Waller v. Robertson Trf. Co., 195 Mo. App. 280. (2) Appellant's belated contention that cause should be reversed because judgment is against the Union Pacific Railway Company instead of the Director General of Railroads is without merit, because: (a) Preston was injured on December 30, 1917, one day before the beginning of Federal control—contract between railroads and director general specifically defined "Federal Control" as meaning from 12:00 o'clock midnight December 31, 1917, to and including the day and hour on which said control should cease." Order No. 50 Director General dated October 28, 1918, provided that pleadings in the cases already pending against railroads on causes of action arising during "Federal Control" and after December 31, 1917, may be amended on application substituting the name of the director general of railroads. Director General of Railroads' Bulletin No. 4 (Revised) page 41 (A); Order No. 50, Director General of Railroads, pp. 334-5; Kersten v. Hines, 223 S. W. 590; Hanks v. Hines, 219 S. W. 978; McGregor v. Railroad,

172 N. W. 841, 4 A. L. R. 1635; Fed. Stat. Ann. (2 Ed.) 775 (1919 Supp.) (b) If it should be held the Union Pacific Railroad was under "Federal Control" when Preston was injured, this court may substitute the present agent of the President provided for by subdivision (a) of Sec. 206 of the Transportation Act of 1920. Kersten v. Hines, 223 S. W. 593; Cravens v. Hines, 218 S. W. 915; R. S. 1909, sec. 1851; Hunter v. K. C. Savings Bank, 158 Mo. 271; Peacock v. Railroad, 175 N. W. 580; Robinson v. Ry. Co., 102 S. E. 532. (c) Order No. 50 of Director General allows amendment without summons. Sagona v. Pullman Co., 174 N. Y. S. 536. (3) The court did not err in overruling defendant's demurrer. Greenwell v. Railroad, 224 S. W. 404; Harwick v. Railroad, 181 Mo. App. 171; Sullivan v. Railroad, 97 Mo. 119; Cahill v. Railroad, 205 Mo. 408; Lancaster v. Railroad, 143 Mo. App. 175; Kippenbrock v. Wab. Ry. Co., 194 S. W. 51; Wightman & Hough Co. v. Nivois, 264 Fed. 160; Railway v. Earnest, 229 U. S. 114; Railroad v. Wright, 239 U. S. 548; Erie Railroad v. Purucker, 244 U. S. 320; So. Ry. Co. v. Smith, 205 Fed. 361; Newkirk v. Pryor, 183 S. W. 685. (4) Appellants objection to the giving of instructions 1 and 2 at request of plaintiff is groundless. Instructions follow strictly the law as laid down and approved in many cases. Railroad Co. v. Purucker, 244 U. S. 322; Union Pac. v. Hadley, 246 U. S. 330; Ry. Co. v. Brown, 229 U. S. 317; Ry. Co. v. Proffitt, 241 U. S. 62; Ry. Co. v. Cole, 214 Fed. 950; Ry. Co. v. Earnest, 229 U. S. 114; Railroad Co. v. Horton, 233 U. S. 492; Hardwick v. Railroad, 181 Mo. App. 171. (b) The court properly refused defendant's requested instructions 10 and 13. Instruction No. 10 was a comment on the evidence, invaded the province of the jury, and would have amounted to a directed verdict for defendant. Instruction No. 13 was properly refused because it invaded the province of the jury, was too general, and directed a verdict for defendant irrespective of negligence of defendant. (5) Appellant's contention that plaintiff's counsel was guilty of misconduct is

groundless. Norris v. Ry. Co., 239 Mo. 721; Dutcher
v. Railroad, 241 Mo. 177; Ostertag v. Railroad, 261 Mo.
479. (6) (a) Verdict was not excessive. The trial
court forced plaintiff to enter a *remittitur* and was in a
better position to judge of this matter than this court
could possibly be. Hurst v. Railroad, 219 S. W. 568;
Greenwell v. Railroad, 224 S. W. 410; Hulse v. Belt
Ry., 214 S. W. 156; Dunton v. Hines, 267 Fed. 454. (b)
"Shame and humiliation because of disfigurement may be
an element in the recovery of damages for the jury."
Erie Railroad v. Collins, 253 U. S. 77. (c) It is common
knowledge that in February, 1919, when this verdict was
returned, costs of living had reached dizzy heights and
the value of the American dollar depreciated in purchas-
ing power to forty or fifty per cent of its pre-war pur-
chasing power. It has been uniformly held by this and
the appellate courts of the country generally that the
jury had the right to take into consideration this condi-
tion. Greenwell v. Railroad, 224 S. W. 405.

JAMES T. BLAIR, J.—This is an appeal from a
judgment for damages for injuries respondent received by
reason of having been struck by a freight 'car which was
being pushed by a switch engine along a main line track
in Kansas City, Kansas. At the point where respondent
was injured the main line runs east and west and is
double tracked and the two tracks are joined by what is
known as the Armourdale connection cross-over switch.
Several hundred feet east of this cross-over what is called
the southwest lead leaves the south track of the main line
and runs in a southwesterly direction. From this lead
**Statement**   switch tracks branch off and run westward
              parallel to the main line and on the south side
of it. Three switching crews were working in this part
of the yard—that of which respondent was a member,
Milam's crew and Williams' crew. The injury to re-
spondent occurred about 6:45 a. m., December 30, 1917.
The cross-over led from the north main line track south-
eastwardly about seventy feet to the south main line

track. The switch engine, of the crew of which respondent was a member, had moved westward along the north main line track, had passed the cross-over and had proceeded to a tank to take water. Its next movement required that it go east to the cross-over and then along that connection and out upon the south main line track. It was respondent's duty to line the cross-over switches for that movement. This he proceeded to do and set the north cross-over switch so that his engine could go into the cross-over when it had completed taking water. Milam's crew and engine were to the east on the north main line track. Williams' crew and engine had gone down the southwest lead and into the second switch track leading therefrom and were then at no great distance from a point on the switch track directly south of the south cross-over switch which respondent was about to line for his engine. The evidence tends to show that the weather was cold and that while it was not entirely dark the men were still using their lanterns; that respondent attempted to line the south cross-over switch and found ice between the switch points and the rails and was unable to remove this at once. He then returned to the north cross-over switch and lined it for the main line and went back to the south cross-over switch to get the ice out of the points. About this time Williams came across from his engine, and the evidence tends to show that respondent informed him the switch did not work; told him he would line it and get his engine through the cross-over first if he could before Williams' crew got out on the main line; but that if Williams got out first "let me know and I will stay in the clear and let you go and then we can go on out." Williams' engine was to go out of the switch track on which it was working, then out on the south main line track, and then move westward to a track entered from the south main line track by a switch west of the cross-over track. The evidence further tends to show that respondent then got a car bolt and undertook to remove the ice which prevented the switch from working; that he got upon his knees close beside the south

rail and set his lighted lantern on the rail near but east of him; that he then went to work with the car bolt to dig or break out the ice from between the switch point and the rail; that respondent was in this position when Williams' engine pushed two cars westward along the south main line track without warning of any kind; that it was a custom of long standing in such a movement, on this road and others, to place a switchman upon the end of the advancing string of cars for the purpose of warning any one who might be in a place of danger; that switchman Rogers was upon the end of the car which struck respondent; that Rogers saw respondent when the cars were one hundred to one hundred and fifty feet away; that he gave respondent no warning of any kind and that no bell was rung or whistle sounded or other warning given; that the cars could have been stopped in less than the distance mentioned and, in fact, were stopped in less distance after the car struck respondent.  Rogers testified that if respondent was kneeling near the rail, as he said, with a lighted lantern sitting beside him, as he testified, that he, Rogers, should have seen and warned him and that it would have been his duty to do so.  There was other evidence to the same effect.  Respondent says he had looked up the track and had seen no cars within two hundred feet, the distance he could see at that time in the morning, but that in a short time, about a "minute," he glanced up, saw the approaching cars and was almost immediately struck.  He was seriously hurt.

There was evidence conflicting with what has been summarized, but the questions presented do not require that this conflicting evidence be set out here.  Phases of it may be referred to hereinafter and the evidence concerning respondent's injuries will be stated.

I.  It is argued that the instruction in the nature of a demurrer to the evidence should have been sustained because (1) there was no evidence respondent was seen in a position of peril in time to have warned him and averted the injury, or (2) to have stopped the cars and prevented the injury; (3) that respondent's testimony

shows he could not have heard a warning if it had been given in time; (4) the risk was-assumed as a matter of law; (5) because the properties of the Union Pacific were under the control of the United States Government on December 30, 1917, and appellant was not liable for the injuries respondent suffered.

**Demurrer to Evidence.**

The case was submitted to the jury on the humanitarian doctrine.

(1) While there is countervailing evidence there was ample evidence respondent was seen in a position of danger in time to have warned him and, in fact, to have stopped the train and saved him. This evidence is summarized in the statement. Rogers testifies he saw respondent at a distance greater than that necessary to stop the train before striking him. It is true Rogers says respondent was not in a place of peril when he saw him. But respondent's testimony is to the effect that he was kneeling beside the rail long before the cars reached the point from which Rogers says he saw him and continued in this position almost until the moment of impact, obviously oblivious of the approach of the cars. Whether respondent was in the position he testifies he was in was a question of fact the jury settled in favor of respondent. There was ample evidence, and Rogers so testifies, that if respondent was in the position he says he was in, it was the duty of Rogers to warn him or stop the train, and it is testified to by everybody that he did neither in time. The evidence showed the cars could have been stopped in less distance than that between respondent and Rogers when Rogers says he first saw respondent, and it is a fact that they were stopped in less distance when the stop signal was given just as respondent was struck.

**Time to Warn.**

(2) The rule that switchmen are expected to look out for themselves is modified by the custom to warn which was pleaded and proved and is not applicable to a case in which cars are propelled, after an agreement to

notify, such as the evidence tends to show Williams made,
toward a switchman down upon his knees beside
**Custom to Warn** the rail engaged in picking ice out of switch
points, who is seen to be in a position of peril
and oblivious of danger and no warning is given nor the
cars checked nor stopped.

(3) It is contended that the evidence conclusively
shows that respondent could not have heard a warning
if one had been given by Rogers and, therefore, the fail-
ure to give a warning was not negligence. This argument
proceeds upon the idea that respondents' head was so
wrapt that he could not hear and that his testimony that
no warning was given is of no probative force in the
face of the testimony of others, that Rogers did "yell"
at him just before the car struck him. These
**Ability to Hear Warning.** were questions of fact. Rogers testified he
did not warn respondent until the cars were
almost upon him. True, he says the reason was that re-
spondent was not down by the rail but walking toward
the track and he assumed he would not walk into the cars.
But whether he was to be believed as to this last in con-
tradiction to respondent's testimony was for the jury.
The fact that he did not warn respondent in time, if he
was disbelieved on this last point, is proved by his own
testimony.

(4) It is insisted respondent assumed the risk, as
a matter of law. Since this case proceeds under the
Federal Employers' Liability Act, the Federal rule as to
assumption of risk applies. [Quigley v. Hines,
**Assumption of Risk.** 291 Mo. 23.] Upon this phase of the case ap-
pellant cites Sea Board Air Line v. Horton,
233 U. S. 503; Jacobs v. Southern Railroad, 241 U. S.
229; C., R. I. & P. Railroad v. Ward, 252 U. S. 18; Erie
Ry. Co. v. Purucker, 244 U. S. 320; Chesapeake & Ohio
Ry. Co. v. DeAtley, 241 U. S. l. c. 313, and Same v. Prof-
fitt, 241 U. S. 462. These cases do not add anything to
the rule that "the servant assumes extraordinary risks
incident to his employment or risks caused by his mas-
ter's negligence which are obvious or fully known and

appreciated by him.'' [Boldt v. Penn. R. R. Co., 245 U. S. 1. c. 445; Quigley v. Hines, supra.] No authority is cited for the proposition that an employee assumes the risk of having cars driven upon him without warning after he is discovered in a position of peril and condition of obliviousness to his danger. The question of assumption of risk was submitted to the jury.

II.  Objections are made to the instructions.

(1)  Plaintiff's instruction 1 was long but not so long as many which appear here. It is not unnecessarily long. The case required the predication of numerous facts before a verdict for plaintiff would be authorized. These facts it was necessary to incorporate in the instruction. This explains its length. Facts necessary to a verdict cannot be omitted for brevity's sake. It is also suggested that a clause in this instruction might have given the jury the impression that there was a duty to warn respondent whether or not he was seen in a position of peril and seen to be oblivious thereof. The difficulty with this assignment is that the instruction, but a few lines before the criticized language appears, expressly requires the jury, before returning a verdict for respondent, to find the identical facts which counsel argue the jury may have thought it was not required to find. It is also suggested that the instruction did not submit the issue of proximate cause to the jury in that it ''did not require the jury to find that defendant saw plaintiff in a position of peril in time thereafter to have avoided the injury.'' The instruction expressly requires this very finding before a verdict for respond-'ent is returned. It is further contended that the jury should have been required to find, before verdict for respondent, that respondent could have heard a warning had one been given. The instruction did require the jury to find the duty to warn, the opportunity to warn, the failure to warn, and then that this was negligent and that respondent's injury was a direct result of such neg-

*Instructions.*

ligence, before finding for respondent. This covered the issue whether respondent could have heard, had a warning been given. The insistence that there was no evidence warranting the submission of this case on the humanitarian doctrine has been considered in a preceding paragraph.

(2) The objection to Instruction 2, given for respondent, is founded upon the view that respondent assumed the risk as a matter of law. This has been considered in a preceding paragraph.

(3) The trial court refused to instruct, in substance, that there was no evidence that respondent was seen in peril in time, by ordinary care, "to thereafter have stopped the cars and avoided the accident." It is contended that when the cars were fifty feet from respondent there was no occasion to stop them and there was no evidence they could have been stopped in a less distance. This is without force unless it assumes the truth of Rogers' testimony that respondent was not down by the track but was approaching it. Rogers saw respondent at a distance of much more than fifty feet. If respondent's testimony is true he was then in a perilous position and discernibly oblivious of the approach of the cars. The trial court's ruling was right.

(4) It is insisted the trial court erred in refusing to instruct that respondent was guilty of contributory negligence as a matter of law. It is argued that the issue should not have been left to the jury but that they should have been required to take contributory negligence as an established fact and required, as a matter of law, to make a proportionate reduction in the damages respondent suffered. Appellant reasons that it was negligence for respondent to place himself in a position in which he was likely to be struck by cars being moved in switching operations which he knew were impending and to fail to keep an effective lookout for such cars. [Gabal v. Railroad, 251 Mo. l. c. 268; Clark v. Railroad, 242 Mo. 606; Eppstein v. Railroad, 197 Mo. l. c. 729; Degonia v. Railroad, 224 Mo. l. c. 587;

State ex rel. v. Peters, 241 S. W. 121, and others.] These cases are not in point. Under the doctrine upon which this case was submitted the negligence of respondent, if any, in taking a position so near the rail that he might be struck by a passing car was not any part of the efficient cause of his injury if he was, as the jury found, seen in peril, of which it was apparent he was oblivious, in time for an effective warning to have been given or the train to have been stopped. Since respondent's act was not a part of the efficient cause of the accident it could neither defeat his action under the state law nor entitle appellant, as a matter of law at least, to a reduction of damages under the Federal Employers' Liability Act.

III.  It is urged that respondent's testimony is so highly improbable that a new trial should have been granted. The trial court, who saw the witnesses, did not take this view and he alone can award a new trial on the weight of the evidence. Respondent's testimony **Weight of Evidence.** is not so in conflict with physical conditions or laws of nature that it must be rejected for that reason. The trial court's ruling on the probability and credibility of respondent's testimony is final so far as concerns the point now made.

IV.  Objections to conduct of counsel are made. One instance involves the action of the trial court in refusing to reprimand respondent's counsel for asking one of appellant's witnesses a question said to be objectionable. The court sustained an objection to the question and, on the request to reprimand, said he believed the ruling sustaining the objection was enough. The question implied that the witness was attempting to shield **Conduct of Counsel.** appellant. It came after a series of evasive answers. It is not contended respondent's counsel offended in like manner in any other question. The attitude of the witness laid him open to the inference the question drew. Such an inference drawn in the ar-

gument would have been justifiable as the record appears here. In the circumstances there was no error. During the argument an exception was taken to a remark of counsel. The remark was withdrawn. Appellant's counsel asked that the jury be discharged. This was refused. Appellant does not argue the point. No attempt is made to show the incident does not fall within the general rule. [Ostertag v. Railroad, 261 Mo. l. c. 457.] In two other instances in which appellant now complains of argument no objection or exception was made at the time, and in the remaining one an exception to the ruling was taken by respondent but none by appellant. These are not reviewable.

V. It is urged that the judgment is excessive. The verdict fixed the amount at $15,000. It was signed by nine jurors. The trial court required a *remittitur* of $5,000 and rendered judgment for $10,000. It is this sum which appellant now contends is too great. The evidence tends to show obligations for medical services of $200 and loss of earnings up to the time of the trial of $1,000. Respondent was in the early thirties.

Amount of Judgment. His injuries incapacitated him for further service in his occupation as a switchman. He was able to work part of the time at other things and was earning at the rate of ninety dollars per month for the time he was able to work, at the time of the trial. His earnings were materially less than a switchman's pay. The evidence tended to show that the car struck him in the back and right side and knocked him about twenty-five feet; that he struck on his side and slid some distance in the cinders beside the track; that cinders were ground into his forehead, face, nose, right eyelid, lips and chin to a depth of one-fourth to three-eighths of an inch; that his lower lip was split through to his teeth and down to his chin; that his nose was broken in two places, and the septum was displaced so that one nostril was practically closed and useless and was subject to infection; that cinders were ground into the top of his head and part

of his hair torn off; that the blow had injured his back and that it pained him; that he continued to suffer from headaches, nervousness and inability to sleep normally; that his hip was injured and pained him and that his knees were torn and bruised and that the injury to one of these had resulted in synovitis and that the injuries to the hip and knee had resulted in a limp; that his taste had been affected; the rectus muscle of his right eye was partially paralyzed and the eye would "turn out" and he "saw double" and the eye could not be used, except for a short time, without rest; the hearing in one ear was materially affected; that the injuries to the face disfigured respondent greatly. The evidence also tended to show the disfigurement, the injury to the eye, the injury to the hip and knee and probably the back, and the limp were permanent, and that the injuries to the nose and hearing were so unless a surgical operation was performed upon the nose. There was also evidence that the kidneys had suffered to an extent that respondent was afflicted with irregularity and too great frequency in voiding urine. The testimony as to respondent's disfigurement tends to show it was extreme. Respondent suffered considerable pain from his injuries and continued to suffer from them. If it be assumed respondent could work regularly at $90 per month his loss per month would amount to $22 without taking into consideration the increase of switchman's wages after January 1, 1918. Taking his expectancy into consideration and computing his probable loss of future earnings on that basis and then adding thereto his medical bill and actual loss of earnings up to the time of the trial, the aggregate would approach the total amount of the judgment. When this is considered and his serious and permanent injuries, disfigurement and pain and suffering are also taken into account, it cannot be said the judgment is excessive.

VI. The injury occurred on December 30, 1917. This action was begun February 5, 1918. The name given defendant sued was "Union Pacific Railroad Company."

The Director General did not ask to be substituted and the railroad company did not ask that he be substituted. At the beginning of the trial in 1919 counsel objected, *ore tenus,* that the petition did not state a cause of action

**Federal Control.**

for specific reasons which did not include that now made, which is that this court should hold that no case was made "because the properties of the Union Pacific Railroad Company were, at the time of the injury, December 30, 1917, under the exclusive control of the United States Government, and were being operated, on December 30, 1917, by the Director General of Railroads and not by the Union Pacific Railroad Company."

Under the Act of August 29, 1916, which authorized him so to do, the President, by proclamation, took charge of the railroads of the country, as of twelve o'clock noon, December 28, 1917. Of this and other proclamations of the President the courts take judicial notice. [Givens v. Zerbst, 255 U. S. 11, and cases cited; Moon v. Hines, 205 Ala. 355, and cases cited; Railway Co. v. Nixon, 131 N. E. (Ind. App.) l. c. 534; West v. N. Y. Railroad Co., 233 Mass. 162; Spring v. Am. T. & T. Co., 86 W. Va. 192; Hettleman v. Frank, 136 Md. 351; Kersten v. Hines, 283 Mo. 623; Taylor v. W. U. Tel. Co., 231 S. W. 78.] The proclamation referred to contained the following:

"From and after twelve o'clock on the said twenty-eighth day of December, 1917, all transportation systems included in this order and proclamation shall conclusively be deemed within the possession and control of said Director without further act or notice. But for the purpose of accounting said possession and control shall date from twelve o'clock midnight on December 31, 1917."

The power of the President under the Act of 1916 to take over the railroads cannot be denied, and the fact that they were taken over and went into the control and possession of the Director General at twelve o'clock noon, on December 28, 1917, is established by the explicit language of the proclamation by which they were taken over.

Respondent's injury, therefore, occurred during Federal control. The result of Federal control was absolute exclusion of the railroad companies, as owners, from the use and management of their property and the complete negation of the idea of any liability on their part, as owners and as corporations, for damages for injuries resulting from the negligence of employees operating the roads. [Northern Pacific Ry. Co. v. North Dakota, 250 U. S. 1. c. 148; Kersten v. Hines, 283 Mo. 623; Missouri Pacific Ry. Co. and Hines v. Ault, 256 U. S. 554, 41 Sup. Ct. Rep. 593.] The Union Pacific Railroad Company was not, therefore, in possession of its property on December 30, 1917, and in the circumstances could not be liable, as such, for damages for injuries to respondent on that day. The date taken as a basis for accounting purposes does not affect the date of taking possession. It is merely an exception to the general language of the proclamation on that head. Counsel have not called to our attention, nor have we been able to find anything to show, that the time fixed in the President's proclamation was changed and the press carried notice of the actual taking over of the roads at the hour fixed thereby.

After providing that control should be exercised and operation conducted by a Director General, thereby designated, the proclamation of December 26, 1917, contained the following:

"Said director may perform the duties imposed upon him, so long and to such extent as he shall determine through the Board of Directors, Receivers, officers and employees of said systems of transportation. Until and except so far as said Director shall from time to time by general or special orders otherwise provide, the Board of Directors, Receivers, officers and employees of the various transportation systems shall continue the operation thereof in the usual and ordinary course of the business of common carriers in the names of their respective companies.

"Except with the prior written assent of said Director, no attachment by mesne process or on execution

shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgments rendered as hitherto until and except so far as said Director may, by general or special orders, otherwise determine.''

This last quoted language was apparently the only guide in act or proclamation upon which counsel could rely in bringing the instant case. In these circumstances they interpreted this to mean that the railroad company could be and should be named as defendant. ''In the absence of explicit direction'' this was the natural thing to do when it was ''sought to hold the Government liable.'' [Mo. Pac. Ry. Co. and Hines v. Ault, supra.] This was done in many cases and there are many and conflicting decisions upon the propriety and effect of instituting an action in that way. Some courts held the action must be against the Company and some held it must be against the Director General. These usually involve a construction of the Act of March 21, 1918, which had not been passed when this action was begun. Its construction has since been settled in the case last cited. It is common knowledge, supplemented by a reasonable inference from Section 10 of the Act of Congress of March 21, 1918, and directly referred to in Order No. 50, subsequently issued, that actions for injuries occurring under Federal control were brought in large numbers and that the defendant was given the name of the corporation which owned the railroad upon which the injury occurred. Such defendants were not liable and there was no thought that judgments could be collected from them, but there was then no express provision for suing any other, and the proclamation explicitly provided that ''suits may be brought by and against said carriers and judgments rendered *as hitherto* until and except'' as the Director might otherwise subsequently determine. This language seems to authorize the use of the corporation's name as a defendant in such action as that before us for the purpose of trying out the question of liability,

the corporation to be protected against the judgment by other parts of the proclamation. The language of the Act of March 21, 1918, is somewhat different from that of the proclamation of December 26, 1917, pertinent to this question. In the proclamation the Director and the carriers are named as different authorities or entities, and the suability of the carrier is continued as to "such suits . . . as hitherto" except as the Director shall by order otherwise determine. He had issued no such order when this action was begun. While the President might not fix a liability upon a railroad under Federal control by proclamation or other means (Railway and Hines v. Ault, supra), he might prescribe the manner in which the action should be brought to enforce liability for negligence of the employee of the Director, and might authorize this or that name to be used to represent him as a party in such actions, always provided no such use of any name should result in liability on the part of any one save the Government or the Director General, as its representative. In this situation respondent began his action. Under the proclamation of the President and orders of the Director General the former employees of the company had become the employees of the Director General, exclusively, and service upon them, as formerly, was service upon him in an action of this kind. [Lanier v. Pullman Co., 180 N. C. 406.] This case was not tried for a year, and meantime, in October, 1918, Order No. 50 was issued by the Director General. That order of the Director General provided that an action like this, if thereafter brought, should be brought against the Director General, and that "the pleadings in all such actions . . . now pending against any carrier company for a cause of action arising since December 31, 1917, based upon a cause of action arising from or out of the operation of any railroad . . . may on application be amended by substituting the Director General of Railroads for the carrier company as party defendant and dismissing the company therefrom." It will be observed this order makes no provision for a cause of action aris-

ing on December 30, 1917, as did that of respondent. The courts soon began taking conflicting views concerning the validity of Order No. 50 in so far as concerned the language just quoted. At the time this case came to trial this question was yet undecided by the Supreme Court of the United States. Counsel appeared in this case and, as stated, asked no substitution or dismissal of the company, so far as the record shows. Their answers to the amended petition, filed February 5, 1919, consisted of a general denial and pleas of contributory negligence and assumption of risk. No suggestion seems theretofore to have been made that the action was improperly brought. A jury was subsequently empaneled and sworn, and as the taking of testimony was about to begin objections to the reception of testimony were made *ore tenus,* but no reference appears to any claim that the wrong defendant was named in the petition or that the defendant was wrongly named. The objections made were overruled and the taking of testimony proceeded for the better part of the day. At that juncture the question whether the Union Pacific or the Director General was in charge of the Union Pacific at the time respondent was injured was broached, and it appeared from the colloquy which ensued that on the forenoon of that day one of the counsel appearing for defendant had suggested that he would like to have the Director General substituted as defendant, and his co-counsel intervened with "wait a minute," and the suggestion was not repeated or pressed further. During this colloquy counsel for respondent asked appellant's counsel what position they took upon the question as to who was in charge of the property and liable. Counsel on both sides clearly were in doubt whether the road went into the possession of the Director General before midnight of December 31, 1917. As a matter of law, under the Proclamation of the President, it went into his hands at mid-day December 28, 1917. Counsel for defendant refused, during this colloquy, to take either position upon this question. Respondent's counsel offered to substitute the Director General if defendant's counsel would agree

that the Director General was in charge when respondent was hurt. Opposing counsel refused this offer on the ground that they had no authority on behalf of either the company or the Director General to attempt "to fix liability, if any, as between the plaintiff and either of said parties." The agreement suggested was as to a matter of law, and the court might well have ordered the substitution but did not do so. Defendant's counsel refused to consent to it. From the colloquy it is reasonable to infer that counsel appearing for defendant were counsel both for the company and the Director General. As much is implied in what is said. They were taken into his service as were other officers and employees. The implication that they represented the Director is very much strengthened by the fact that they were then appearing in a case in which his liability alone was shown by the petition, and in which service had been had upon employees who represented him for the purposes of service. Served in this way, the Director General did not set up that he was sued under a wrong name. The effect of the attitude of counsel was a refusal to have the Director General substituted when the offer to substitute him was made by respondent's attorneys. The trial then proceeded and was contested fully upon every issue, as it has been here.

Whether or not the fact that Order No. 50 authorized suit and substitution only in cases based upon causes of action arising after midnight of December 31, 1917, prevents the application of that order to this case makes no difference in view of the broad language of the Transportation Act of 1920. Paragraph (d) of Section 206 of that Act (41 Stat. L. 462) provides: "Actions, suits, proceedings and reparation claims, of the character above described, pending at the termination of Federal control shall not abate by reason of such termination, but may be prosecuted to final judgment, substituting the agent designated by the President under subdivision (a)." The "actions" referred to (subd. a, sec. 206) include all actions based upon causes of action arising out

292 Mo.—30

of the operation of railroads under Federal control. The term includes the instant case.

In the circumstances the provisional motion of respondent should be sustained and the present Federal agent, appointed by the President under Section 206 of the Act of 1920, substituted as defendant and appellant. [Adams v. Ry., 229 S. W. 790; Kersten v. Hines, 283 Mo. 623; Robinson v. Ry., 150 Ga. 41; Gundlach v. Ry. Co., 172 Wis. 438; Peacock v. Ry., 208 Mich. 403.]

It results that the Federal agent is hereby substituted as indicated and ordered to be substituted on motion in the circuit court judgment, and the judgment is affirmed as against him. All concur.