### Stephanie SASNETT, a Minor by and through her Guardian and Natural Mother, Maria Sasnett, et al., Appellants,

### v.

### Tina M. JONS and City of Kansas City, Respondents.

### No. WD 75106.

Missouri Court of Appeals,
Western District.

April 2, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied April
30, 2013.

Application for Transfer Denied
June 25, 2013.

430

Andrew J. Gelbach, Christopher P. Sweeny and William D. Vandever, Kansas City, MO, for appellant.

Douglas McMillan, Chad Stewart, and James C. Morrow, Kansas City, MO, for respondent.

Before Division Two: KAREN KING MITCHELL, Presiding Judge, JAMES E. WELSH, Chief Judge, and LISA WHITE HARDWICK, Judge.

LISA WHITE HARDWICK, Judge.

The widow and three children of Stephen Sasnett ("the Sasnetts") appeal from a judgment in their favor on their wrongful death claim against the City of Kansas City ("the City") and Tina Jons ("Jons"). On appeal, the Sasnetts contend that the circuit court failed to instruct the jury that Jons owed a higher standard of care than the City owed and this error resulted in the jury allocating a low percentage fault to Jons. The Sasnetts also contend the court plainly erred in admitting Jons's testimony that she has three children and that she understood that the Sasnetts wanted her to go to jail. The Sasnetts allege this testimony caused the jury to allocate too little fault to Jons and to award them less damages. Lastly, the Sasnetts assert the court erred in denying their motion for costs. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

Around 9:00 a.m. on December 21, 2005, Stephen Sasnett ("Sasnett") was eastbound on 18th Street in Kansas City when he stopped at a red light at the intersection of 18th and Charlotte ("the intersection"). At the same time, Ronald Brooks ("Brooks") was southbound on Charlotte and Jons was westbound on 18th Street. As Brooks approached the intersection, he had a green light. As Jons approached the intersection, she had a red light. Jons failed to stop at the red light and proceeded into the intersection at the same time as Brooks. Brooks's car hit the side of Jons's SUV, causing the SUV to go airborne. Jons's SUV landed on the cab of Sasnett's truck, killing him.

Sasnett's wife, Maria, and his three children subsequently filed a petition for damages for wrongful death against the City, Jons, and Brooks. Before trial, the Sasnetts settled their claim against Brooks for $250,000. The case proceeded to a jury trial on the Sasnetts' claims against the City and Jons.

The evidence at trial showed that numerous accidents had occurred at the intersection in the past. Lynette Maxwell, an employee of the medical clinic located at the corner of the intersection, testified that, over the twenty-year period that she had worked there, she recalled as many as one or two accidents per month. In fact, Maxwell called 911 to report accidents at the intersection so frequently that she was instructed to stop calling 911 unless there was an injury. Maxwell testified that the two pedestal traffic signals for westbound drivers at 18th and Charlotte were hard to see and that drivers could confuse the overhead mast arm signal at the next intersection, which was 18th and Holmes, as being the signal for the intersection of 18th and Charlotte. Maxwell agreed that, "unless somebody was looking really, really, really, really hard it was hard to see and know the difference" between the signals for 18th and Charlotte and 18th and Holmes.

Brian Masterson, the police officer who investigated the accident, testified that the lights at those two intersections were not synchronized. Masterson agreed that, if the lights at 18th and Holmes were green and the lights at 18th and Charlotte were red, that could send a confusing message to drivers due to the placement of the signals.

Steve Worley, a former traffic engineer for the City, testified that the traffic signals at the intersection for westbound drivers met the requirements of the Manual of Uniform Traffic Control Devices. Never-theless, the City had identified the intersection as a high accident location more than four years before the accident because the intersection, despite its low traffic volume, had an average of ten accidents per year. This prompted Worley to ask Tony Nasseri, one of the City's subordinate traffic engineers, to investigate and evaluate the need for safety improvements to the intersection.

Following his investigation, Nasseri drafted a memo to Worley recommending safety improvements for the intersection. In the memo, Nasseri stated that, from January 1, 1999, to July 31, 2001, the intersection experienced twenty-six reported accidents. Fifty-eight percent of those accidents were right-angle collisions like the one that occurred in this case. According to Nasseri, the predominant cause of those accidents was that the driver did not see the traffic signal or failed to stop for a red light. Nasseri stated that, based upon his investigation of the site, poor visibility of the traffic signals may have contributed to the accidents.

Nasseri provided short-range and long-range recommendations in his memo to improve the intersection's safety. His short-range recommendation was to install "Signal Ahead" signs on westbound 18th Street and southbound Charlotte. His long-range recommendation was to install overhead mast arm signals for all approaches to the intersection. The City did not implement either of these recommendations before the accident on December 21, 2005.

Dr. John Glennon, a traffic engineer, testified on behalf of the Sasnetts as an expert in roadway design. Glennon opined that, even for drivers exercising the highest degree of care, the intersection was unreasonably dangerous because: (1) it did not have a mast arm traffic signal or a "Signal Ahead" sign leading up to it; (2)

the signal for the 18th and Holmes intersection was fairly close to the intersection of 18th and Charlotte; and (3) the signals at the two intersections were not synchronized. Glennon testified that the distance between Charlotte and Holmes was "very, very short." He explained that, while a normal short block is 440 feet, the block between Charlotte and Holmes was only 250 feet. Glennon testified that, when traveling westbound on 18th Street, the mast arm signal at the intersection of 18th and Holmes overwhelmed the pedestal traffic signals at the intersection of 18th and Charlotte for several blocks. According to Glennon, a driver could clearly see the overhead lights at Holmes but not the pedestal lights at Charlotte, and a driver could "quite easily" mistake the traffic lights of 18th and Holmes for the closer traffic lights at 18th and Charlotte.

Glennon testified that it is common knowledge in the field of traffic engineering that drivers can confuse lights that are too close together and that, in such circumstances, measures need to be taken to ensure that drivers are not looking at the wrong signal. Moreover, Glennon stated that anytime a pedestal light is close to a mast arm light, there is a risk of miscommunication to drivers. Glennon testified that, when the City installed the mast arm signal above the Holmes intersection prior to the accident, it should have looked at the signal at the intersection of 18th and Charlotte, especially in light of its high accident rate. According to Glennon, the installation of mast arm signals results in an estimated seventy-four percent reduction in right-angle collisions.

The evidence concerning Jons's involvement in the accident was that, on the morning of the accident, she was taking her son to a doctor's appointment at Children's Mercy Hospital. Jons testified that, as she traveled westbound on 18th Street, she saw the intersection of 18th and Charlotte from two blocks away but never saw the two pedestal traffic signals. Instead, she saw the mast arm signal at the intersection of 18th and Holmes. Because the mast arm signal was green, she proceeded into the intersection.

In addition to the pedestal traffic signals at the intersection, there was a two-foot wide stop bar painted on the street. Jons knew that a stop bar meant there was either a traffic light or stop sign at the intersection, but she thought the overhead mast signal at 18th and Holmes was the traffic signal for 18th and Charlotte.

Jons was not impaired, on her cell phone, or distracted by her son at the time of the accident, but she did not see Brooks until one second before the collision. Although Jons said she slammed her foot on the brake pedal, there were no skid marks or other evidence of her braking.

Jons testified that she was not traveling over the speed limit, which was thirty-five miles per hour. An eyewitness to the accident estimated her speed to be about twenty to twenty-five miles per hour. However, the City's accident reconstruction expert, Stephen Christoffersen, testified that Jons was traveling between thirty-seven and forty-five miles per hour and that Brooks was traveling between forty-three and fifty-three miles per hour. Christoffersen concluded that both Jons and Brooks were speeding and that, had they been traveling the speed limit, Sasnett would not have been fatally injured. Moreover, Christoffersen opined that Jons and Brooks could have seen each other about two and one-half seconds before impact, when Jons was 145 feet from the point of impact and Brooks was 175 feet from the point of impact.

Masterson and another officer who investigated the accident testified that nothing interfered with or made it difficult for

westbound drivers like Jons to see the two pedestal traffic signals as they approached the intersection. No other drivers indicated that they had difficulty seeing the traffic signals that day, and there were no weather conditions at the time that would have prevented Jons from seeing the signals. Moreover, Maxwell testified that Jons and Brooks had unobstructed views of each other as they approached the intersection.

Almost a year after the accident, Jons pled guilty to class D felony of involuntary manslaughter. During the guilty plea hearing, she admitted that she acted with criminal negligence by failing to obey the traffic signals at the intersection. She was placed on thirty days of house arrest and three years of supervised probation. Regarding her guilty plea, Jons testified that she pled guilty because she felt horrible about her part in causing Sasnett's death and because going to trial would cost between $50,000 to $70,000 in attorney's fees. Jons said that it was not until after she pled guilty that she found out about the City's prior investigation into the dangerous nature of the intersection.

On the issue of damages, the Sasnetts asked to be compensated for the damages Sasnett would have been entitled to recover had he lived. They offered evidence that, when Jons's SUV landed on top of Sasnett's truck, the truck crushed down on Sasnett's chest. His legs were pinned in by the door and steering wheel, and he could not be moved. Maxwell, an LPN, felt a faint pulse in Sasnett immediately after the accident and tried to give him rescue breaths, but she believed Sasnett died approximately fifteen to twenty seconds after the collision because he was not able to breathe. According to the medical examiner, Sasnett died from blunt chest and abdominal trauma as a consequence of traumatic asphyxia.

The Sasnetts also sought compensation for the economic loss to the family resulting from Sasnett's death. Sasnett was forty-seven years old at the time of his death and the principal breadwinner for his family. He was employed as the lead electrical technician for MAG–Tronics. In 2005, he had earned approximately $80,000, which was a $17,000 increase from his 2004 salary. Approximately $35,000 of his income was earned from overtime. In addition to his job, Sasnett spent about eighteen hours a week doing chores around the house, including gardening, painting, lawn mowing, fixing up bathrooms, changing the oil in cars, changing the brakes, and other mechanical work. He was in the middle of rebuilding their deck at the time of his death. The Sasnetts offered the deposition testimony of Dr. John Ward, an economist, regarding the economic loss to the family resulting from the loss of Sasnett's income and benefits, household services, and the leisure time shared with his family. Dr. Ward found the economic loss to the Sasnetts to be approximately $1,975,000.

Lastly, the Sasnetts sought compensation for the loss of consortium, companionship, comfort, instruction, guidance, counsel, training, and support they suffered from losing Sasnett as a husband and father. Each of the Sasnetts testified regarding their losses in these areas.

At the close of the evidence, the Sasnetts moved for directed verdicts on the issue of the City's and Jons's liability. The court denied the motion as to the City's liability but granted the motion as to Jons's liability.

Consequently, the Sasnetts proffered a verdict-directing instruction concerning Jons's liability that stated that, under the law, Jons was liable to the Sasnetts for damages because she failed to obey the traffic signal at the intersection and that

the jury must assess a percentage of fault to her. Counsel for the Sasnetts represented to the court that this was "the appropriate submission," and the court accepted this instruction. The verdict director concerning the City's liability told the jury that it must assess a percentage of fault to the City if it believed: (1) there was not a mast arm signal or a "Signal Ahead" sign at the intersection and, as a result, the intersection was not reasonably safe; (2) the City knew or by using ordinary care could have known of this condition in time to remedy it or warn of it; (3) the City failed to use ordinary care to remedy or warn of the condition; and (4) such failure directly caused or directly contributed to cause the fatal injury to Sasnett. The instruction defined "ordinary care" to mean "that degree of care that an ordinarily careful person would use under the same or similar circumstances." The verdict form asked the jury to assess percentages of fault to Jons and the City.

The City objected to the instructions on the basis that they failed to instruct the jury that Jons, as a driver, was held to a higher standard of care than the standard to which the City was held. The City argued that, since the jury was to compare the City's fault to Jons's, the court should instruct the jury that Jons owed the highest degree of care, while the City owed only ordinary care. The City offered a proposed verdict director that told the jury that it must assess a percentage of fault to Jons, whether or not the City was partly at fault, if it believed: (1) Jons either ran a red light and/or failed to keep a careful lookout, and/or drove at an excessive speed; (2) Jons was thereby negligent; and (3) Jons's negligence directly caused or directly contributed to cause any damage the Sasnetts may have sustained. The instruction defined the terms "negligent" and "negligence" to mean "the failure to use the highest degree of care." The instruction defined the phrase "highest degree of care" to mean "that degree of care that a very careful person would use under the same or similar circumstances." The court overruled the City's objection and rejected the City's proposed verdict-directing instruction concerning Jons's liability.

The Sasnetts did not join in the City's objection to the jury instructions or in the City's proffer of the proposed verdict-directing instruction concerning Jons's liability. When the court asked if they had any objections to instructions, the Sasnetts said they did not.

The City then requested the court's permission to argue that Jons owed the highest degree of care during closing arguments. Before the court ruled on the City's request, the Sasnetts' counsel stated that he believed such argument should be allowed because Jons's owing the highest degree of care was "in the evidence several times" through various witnesses. The court granted permission to argue that Jons owed the highest degree of care.

During closing arguments, both the Sasnetts and the City repeatedly mentioned to the jury that Jons owed the highest degree of care. The Sasnetts asked the jury to find that Jons was seventy-five to eighty-five percent at fault for the accident and the City was fifteen to twenty-five percent at fault. They also asked for a damages award in excess of $10 million.

The jury returned a verdict finding Jons ten percent at fault and the City ninety percent at fault for the accident. The jury found the Sasnetts' total damages to be $2 million. The court entered judgment in accordance with the jury's verdict, with a few modifications. The court noted in its judgment that the Sasnetts had previously settled with Brooks for $250,000 and credited that amount against the damages award, reducing it to $1,750,000. The

court further noted that the City's liability was capped at $381,759. Accordingly, the court entered judgment against Jons in the amount of $175,000 and against the City in the amount of $381,759.

The Sasnetts subsequently filed a motion for new trial or for additur and a motion for costs. The court denied both motions. The Sasnetts appeal.

## ANALYSIS

### *Failure to Instruct on Jons's Higher Standard of Care*

In Point I, the Sasnetts contend the court erred by not instructing the jury that Jons owed a higher standard of care than the City owed. They argue that the court's failure to instruct the jury that Jons owed the highest degree of care, while the City owed only ordinary care, resulted in the jury allocating too little fault to Jons.

■ The Sasnetts acknowledge they did not raise this allegation of error during the instruction conference. Under Rule 70.03, "No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Nevertheless, the Sasnetts assert that, because the City raised this objection, the alleged error was "properly preserved" for appeal. We disagree.

■ "[W]here several parties are entitled to object, an objection made by only one party will not inure to the benefit of a party not joining in the objection, for purposes of preservation of the objection for appeal." *Robertson v. Cameron Mut. Ins. Co.*, 855 S.W.2d 442, 447 (Mo.App.1993). See also *State ex rel. St. Louis Bridge & Terminal Rys. Co. v. Haid*, 325 Mo. 532, 29 S.W.2d 714, 716 (1930); *Preston v. Un-*

*ion Pac. R. Co.*, 292 Mo. 442, 239 S.W. 1080, 1084 (1922); *T.S. v. P.S.*, 797 S.W.2d 837, 841 (Mo.App.1990). A party "is not entitled to reversal on account of any errors of which it did not complain merely because there is another [party] who did complain." *Haid*, 29 S.W.2d at 716.

Moreover, although the Sasnetts argue that the City's objection satisfied the rationale for requiring objections because it gave the circuit court the opportunity to avert error and to make an intelligent ruling, we note that the Sasnetts, as plaintiffs, were in a different position than the City, one of two defendants. It is speculative to presume that the court would have made the same ruling if the Sasnetts had objected. Indeed, in rejecting the City's proposed verdict director instructing on Jons's standard of care, the court noted that "[t]he City did not sue Ms. Jons." The City's objection did not preserve the Sasnetts' allegation of error.

■ " 'Where specific objections to jury instructions were not made prior to submission of the case, the matter is not preserved for review except for plain error under Rule 84.13.' " *Martha's Hands, LLC v. Starrs*, 208 S.W.3d 309, 315 (Mo.App. 2006) (citation omitted). Rule 84.13(c) provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

■ While we have the discretion to review unpreserved claims for plain error, " '[p]lain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections.' " *Atkinson v. Corson*, 289 S.W.3d 269, 276 (Mo.App.2009) (citation omitted). "We will reverse for plain error in civil cases only in those situations when

the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Id.* at 276–77 (internal quotation marks and citation omitted).

"To establish that an instructional error rose to the level of plain error, appellant must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict." *Hensley v. Jackson Cnty.*, 227 S.W.3d 491, 497–98 (Mo. banc 2007) (internal quotation marks and citation omitted). Mere prejudice from the erroneous instruction is not enough. *Atkinson*, 289 S.W.3d at 277. Rather, the appellant "must prove that the error resulted in a manifest injustice or miscarriage of justice." *Id.* (internal quotation marks, citation, and footnote omitted).

The Sasnetts have not met this burden. They offered the verdict-directing instruction concerning Jons's liability and represented to the court that they believed it was "the appropriate submission." Hence, any alleged error as to the submission of that instruction was self-invited and cannot serve as grounds for reversal on plain error review. *State v. Bolden*, 371 S.W.3d 802, 806 (Mo. banc 2012). As for the other instructions, the Sasnetts specifically stated that they had no objection to them. Their affirmative acceptance of the instructions belies any notion that the submission of the instructions resulted in a manifest injustice. *Flood ex rel. Oakley v. Holzwarth*, 182 S.W.3d 673, 679 (Mo.App.2005). "[W]e cannot say that the trial court erred in taking [a party] at their word when they said 'no' when asked if they had any objection to any of the jury instructions." *Id.*

The Sasnetts have also failed to demonstrate any error in the court's submission. The verdict directors for both the City and Jons were proper. Because the court had denied the Sasnetts' motion for directed verdict against the City, the issue of the City's liability was for the jury to decide. Thus, the verdict director against the City, patterned after MAI 31.16, 37.01, and 11.05, correctly instructed the jury to determine the City's liability under the ordinary care standard. Because the court had directed a verdict against Jons, the issue of Jons's liability was not before the jury. Thus, the verdict director against Jons, patterned after MAI 31.07, correctly instructed that Jons was liable to the Sasnetts as a matter of law and that the jury must assess a percentage of fault to her. Since the verdict director did not ask the jury to determine whether Jons was negligent, the court was not required to include MAI 11.03's definition of the term "negligence," which set out the highest degree of care standard. The Sasnetts point to nothing in MAI or case law that suggests that the court should instruct the jury regarding a party's standard of care when the court has predetermined that party's liability on a motion for directed verdict.

The Sasnetts nonetheless contend that, without an instruction setting forth Jons's standard of care, the jury could not properly compare the fault of the City, who owed only ordinary care, with the fault of Jons, who owed the highest degree of care. The record shows, however, that the Sasnetts and the City made the jury well aware of Jons's higher standard of care. The Sasnetts mentioned Jons's higher standard of care three times in their opening statement. Several witnesses testified as to Jons's higher standard of care, a fact which the Sasnetts' counsel noted during

the instruction conference.[1] During closing arguments, the Sasnetts and the City, collectively, discussed Jons's higher standard of care ten times and, on several of those occasions, contrasted it with the City's lower standard of care.

Throughout the trial, the jury was repeatedly and correctly advised of Jons's higher standard of care and, therefore, was able to compare her fault with the City's and assess the percentages of fault accordingly.[2] The Sasnetts have failed to establish the existence of any instructional error, much less instructional error that resulted in manifest injustice or a miscarriage of justice. Point I is denied.

### Admission of Allegedly Improper Testimony

In Points II and III, the Sasnetts assert that the trial court plainly erred in admitting certain testimony by Jons. Specifically, in Point II, the Sasnetts contend the circuit court plainly erred in admitting Jons's testimony that she has three children and that she was a stay-at-home mom before she was required to get a job as a condition of her probation in the criminal case. In Point III, the Sasnetts assert that the court plainly erred in admitting Jons's testimony, "I understand that the [Sasnetts] wanted me to go to jail."

The Sasnetts assert in both points that the testimony was irrelevant and engendered the hatred, passion, or prejudice of the jury. They claim the admission of this evidence resulted in manifest injustice or a miscarriage of justice in that the jury apportioned only ten percent of the fault to Jons and awarded Maria Sasnett damages for only her economic loss. Because the Sasnetts did not object to any of this testimony at trial, they request plain error review.

As noted *supra,* while Rule 84.13(c) affords us discretion to review for plain error, " '[p]lain error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections.' " *Atkinson,* 289 S.W.3d at 276 (citation omitted). "[I]n determining whether to exercise our discretion to provide plain error review, we look 'to determine whether there facially appears substantial grounds for believing that the trial court committed error that is evident, obvious and clear, which resulted in manifest injustice or a miscarriage of justice.' " *Hogan v. Bd. of Police Comm'rs of Kansas City,* 337 S.W.3d 124, 133 (Mo. App.2011) (citation omitted).

The Sasnetts' claims of error do not meet this standard. Although evidence of a party's family status is generally inadmissible because it is irrelevant and calculated to appeal to the jury's sympathy, its admission is not reversible error, even where preserved, unless "it appears that such evidence affected the merits of the case." *Brown v. Poetz,* 201 S.W.3d 76, 79 (Mo.App.2006). Here, the jury was already aware that Jons was a mother, as the Sasnetts had asked Jons about her son on direct examination. Her later testimo-

---

1. The record indicates that Worley, two police officers, and Glennon testified about Jons's duty to exercise the highest degree of care.

2. That the jury was clearly advised as to the correct standards of care for both parties distinguishes this case from those relied upon by the Sasnetts. In *Lopez v. Three Rivers Electric Cooperative, Inc.,* 26 S.W.3d 151, 158–59 (Mo. banc 2000) and *Root v. Mudd,* 981 S.W.2d 651, 656 (Mo.App.1999), the circuit court instructed the jury as to the incorrect standard of care for one of the parties, and this incorrect standard was argued to the jury. In *Bean v. Superior Bowen Asphalt Co.,* 340 S.W.3d 275, 279–80 (Mo.App.2011), the two verdict directors, both proper under MAI, were in such conflict that the jury wrote a note to the judge expressing confusion over which one to follow.

ny on cross-examination that she has three children was brief and did not belabor the issue. As for Jons's statement that she had to get a job as a condition of her probation instead of continuing to be a stay-at-home mom, we find that such testimony merely followed up on the Sasnetts' numerous questions to her on direct examination regarding the extent of the sentence she received in the criminal case.[3] Likewise, her testimony that she understood the Sasnetts wanted her to go to jail followed up on the Sasnetts' questions to her as to whether she served even "one second in prison" or "one second in the county jail." "Cross-examination as to matters first raised by the appellant during direct examination is not a proper basis for reversible error." *Walley v. La Plata Volunteer Fire Dep't,* 368 S.W.3d 224, 233 (Mo.App.2012) (internal quotation marks and citations omitted).[4]

■■■ Regardless of its admissibility, we fail to see how any of this testimony affected the verdict, let alone resulted in manifest injustice or a miscarriage of justice. The Sasnetts contend that manifest injustice is demonstrated by the ten percent fault assessment to Jons and the inadequacy of the damages award. "[T]he amount

of the verdict, by itself, does not constitute enough proof to establish that the verdict was the result of bias, passion, or prejudice." *Id.* at 235 (internal quotation marks and citations omitted). Over the course of the five-day trial, there was a substantial amount of evidence showing that the intersection was dangerous, that the City had actually identified it as a high accident location several years before this accident, that the City knew the poor visibility of the traffic signals at the intersection was primarily to blame for the dangerousness of the intersection, and that the City had done nothing to fix it. Although Jons admitted that she failed to obey the red light at the intersection, she also testified that she did not see the red light because of the placement of the traffic signals. Given this evidence, we cannot conclude that the admission of any of Jons's testimony resulted in manifest injustice or a miscarriage of justice. Points II and III are denied.

### Denial of Motion for Costs

■■■ In Point IV, the Sasnetts contend that the circuit court erred in denying their motion for costs. They claim that, as the prevailing party, they were entitled to

---

3. The Sasnetts assert that Jons's counsel "exploited" the testimony about her children and the fact that she was no longer a stay-at-home mom by mentioning it in closing argument. The record shows, however, that this argument was in response to the Sasnetts' statement in closing argument that "Tina Jons, as is her right, is going to go back to her family and she's going to be able to have that interaction with her husband and her children and she is going to be able to work and she's going to be able to do all of that." "[T]he law indulges a liberal attitude toward argument, particularly where the comment complained of is fair retort or responds to prior argument of opposing counsel." *Boshears v. Saint–Gobain Calmar, Inc.,* 272 S.W.3d 215, 227 (Mo. App.2008) (internal quotation marks and citations omitted).

4. The Sasnetts also assert that Jons's qualifying her statement by saying that it was her "understanding" that the Sasnetts wanted her to go to jail made the statement inadmissible. In support of this assertion, they cite *Powell v. State Farm Mut. Auto. Ins. Co.,* 173 S.W.3d 685, 690 (Mo.App.2005). In *Powell,* we stated that a witness's testimony that he believes or understands a certain fact does not constitute substantial evidence permitting a finding to that effect. *Id.* We also stated that such testimony "is objectionable and should be rejected." *Id.* (internal quotation marks and citations omitted). Because the Sasnetts' desire for Jons to go to jail was not a disputed factual issue in this case, however, we do not see how Jons's qualifying her statement with the word "understanding" resulted in manifest injustice or a miscarriage of justice.

recover their costs against the City and Jons.

 The award of costs is a matter within the circuit court's sound discretion, and we will not disturb the award absent a showing of an abuse of discretion. *Trimble v. Pracna*, 167 S.W.3d 706, 716 (Mo. banc 2005). To demonstrate an abuse of discretion, the appellant must show that the circuit court's decision " 'was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice.' " *Russell v. Russell*, 210 S.W.3d 191, 199 (Mo. banc 2007) (citation omitted).

After trial, the Sasnetts filed a motion requesting that the court order the City and Jons to pay their $16,682.40 in deposition costs. In opposing the motion, the City argued that the Sasnetts had already recovered these costs from Brooks, as the judgment approving the settlement with Brooks showed that $98,385.65 of the $250,000 settlement was for case expenses.

Consequently, the court ordered the Sasnetts to submit a "current and itemized accounting of what costs already were satisfied by the settlement agreement with defendant Ronald Brooks and what costs remain." Instead of submitting an accounting, the Sasnetts filed a response asserting that no costs were satisfied by the Brooks settlement. The court rejected this assertion, finding that the judgment approving the Brooks settlement specifically allocated $98,385.65 from the settlement amount to the Sasnetts' counsel for case expenses. Because the Sasnetts failed to provide any information to the court showing that the expenses sought in their motion were distinct from the expenses covered by the Brooks settlement, the court denied the Sasnetts' motion for costs. On appeal, the Sasnetts contend that the use of the Brooks settlement to pay their costs does not prohibit them from recovering their costs from Jons and the City.

Pursuant to Rule 77.01 and Section 514.060, RSMo 2000, the prevailing party in a civil action is entitled to recover costs against the other party. Thus, the Sasnetts, as the prevailing party, were entitled to recover their costs against Jons and the City. The Sasnetts were not, however, entitled to recover a second time for their costs that were paid in the Brooks settlement. The judgment approving the Brooks settlement expressly stated that $98,385.65 out of the $250,000 settlement was allocated to pay case expenses. The court gave the Sasnetts the opportunity to show that the $16,682.40 in costs that they were seeking from the City and Jons were not paid in the Brooks settlement. By not submitting the itemized accounting that the court requested, the Sasnetts waived their right to recover any unsatisfied costs from the City and Jons. Because the only evidence before the court showed that the Sasnetts' costs were satisfied in the Brooks settlement, the circuit court did not abuse its discretion in denying their motion for costs.[5] Point IV is denied.

### CONCLUSION

We affirm the circuit court's judgment.

---

5. The Sasnetts contend that the City and Jons will receive a windfall if they do not have to pay the $16,682.40 in costs because the court offset the $2 million damages award with the entire amount of the $250,000 Brooks settlement, which included the $98,385.65 in costs. The record does not indicate, however, that the Sasnetts ever objected to the amount of the offset, or ever argued that the Brooks settlement could not be considered in connection with their motion for costs because it had already been used to offset the damages award.