**Kylie SNELLEN, by and through her Next Friend, Katheryn SNELLEN, Appellant,**

v.

**CAPITAL REGION MEDICAL CENTER, Respondent.**

No. WD 75787.

Missouri Court of Appeals, Western District.

Oct. 15, 2013.

Application for Transfer to Supreme Court Denied Nov. 26, 2013.

Application for Transfer Denied Feb. 4, 2014.

David M. Zevan, Kevin J. Davidson and Rachel L. Roman, St. Louis, MO, for appellant.

Susan Ford Robertson, Kansas City, MO and Edward C. Clausen, Jefferson City, MO, for respondent.

Before Division Two: THOMAS H. NEWTON, Presiding Judge, KAREN KING MITCHELL, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

This is an appeal from a judgment entered after jury verdict in a medical malpractice action arising from the birth and delivery of Appellant. Appellant Kylie Snellen ("Snellen"), by and through her mother, Katheryn McCormick f/k/a Katheryn Snellen ("McCormick"), raised four points of error from the judgment entered in favor of Respondent Capital Region Medical Center ("Capital Region"). The judgment is affirmed.

## FACTUAL AND PROCEDURAL HISTORY [1]

McCormick was admitted to Capital Region's labor and delivery unit for induction of labor on April 3, 1998. At approximately 10 a.m., McCormick began active labor. She delivered Snellen by Cesarean section at 2:50 a.m. on April 4, 1998. At the time of trial, Snellen was a fourteen-year-old girl with a diagnosis of static encephalopathy, more commonly known as cerebral palsy.

At issue in the trial was the cause of Snellen's cerebral palsy. Snellen presented evidence that the cause of her condition was a lack of oxygen during labor and delivery that caused her to suffer hypoxic ischemic encephalopathy (HIE) with resultant brain damage. Snellen contended that during labor and delivery, the doctor, Lydia Keisler ("Keisler"),[2] failed to recognize signs of fetal distress and inadequate

oxygenation. Capital Region presented evidence that Snellen was not deprived of oxygen during labor and delivery and that her cerebral palsy was not caused by HIE.

Further facts as necessary are set forth below as they relate to the individual points on appeal.

## ANALYSIS

Snellen raises four points on appeal. First, she argues that the trial court erred in denying her request for a mistrial after Keisler testified that she had been investigated and vindicated of the alleged negligent acts by the Missouri State Board of Healing Arts ("Board") in contravention of section 537.035 [3] and evidentiary rules precluding introduction of irrelevant, prejudicial information. Second, Snellen argues that the trial court erred in allowing a Capital Region expert to rely upon certain medical literature published to the jury where that expert testified in a pre-trial deposition that he would not be relying on that specific literature. Third, Snellen argues that the trial court erred in denying her request for a jury instruction to strike the testimony of one of Capital Region's experts because that expert gave no opinions which would assist the jury or that were based on a reasonable degree of medical certainty. Fourth, Snellen argues that the trial court plainly erred in its prejudicial comments and questions to counsel during voir dire and in striking one specific, potential juror. After review of each point, we affirm.

---

1. We view the facts in the light most favorable to the jury's verdict. *Mengwasser v. Anthony Kempker Trucking, Inc.,* 312 S.W.3d 368, 377 (Mo.App. W.D.2010) (quoting *Dhyne v. State Farm Fire & Cas. Co.,* 188 S.W.3d 454, 455 n. 1 (Mo. banc 2006)).

2. Originally Keisler was a co-defendant with Capital Region, but she was dismissed from the suit by Snellen before the cause was submitted to the jury.

3. All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

## Point I: Motion for a Mistrial

■ In her first point, Snellen argues that the trial court erred in denying her motion for a mistrial because Capital Region violated section 537.035 and evidentiary rules precluding the introduction of irrelevant, prejudicial information in that Capital Region deliberately elicited testimony from Keisler about strictly prohibited peer-review committee proceedings and findings.

### Background

The asserted error lies in the direct examination of Keisler. The trial transcript shows the following exchange between Keisler, defense counsel Nicole Sublett ("Sublett"), and two of Snellen's attorneys, David Zevan ("Zevan") and Rachel Roman ("Roman"):

Sublett: Now, Doctor, you are licensed in the State of Missouri.

Keisler: Yes.

Sublett: And does the board that licenses you, the Board of Healing Arts, review all medical malpractice claims that are filed in the State of Missouri?

Keisler. Yes.

Roman: Objection.

Sublett: And did the Board review this—

Zevan: Excuse—

Sublett: Case?

Zevan:—me. We need to approach. That's—

Roman: Objection.

Counsel then approached the bench. Outside of the hearing of the jury, Snellen sought a mistrial on the ground that Sublett had stated in front of the jury that there had been an investigation before the Board and that Keisler had been vindicated.[4] Snellen argued that a reference to a

"vindication" from the Board is highly prejudicial and reversible error. The judge and the attorneys then had a lengthy discussion of what everyone said and heard.

The following is part of the exchange:

Court: And I'll stand corrected, but I think the record will reflect that the question that was being asked at the time of the objection, and what the objection shut down, because we approached was: "Isn't it true that every malpractice case gets investigated." I do not believe the attorney said: "Did this one get investigated."

Sublett: No, I said, "Do all of them get investigated."

Court: We can check the record.

Zevan: Well, the record needs to reflect she said, "The State Board of Healing Arts investigates these," and she continued to make that statement, to drown me out, during my objection. That's reversible error. And I'm making a motion for mistrial, based on that statement, which now injected in front of the jury is that she somehow has been investigated and she's been vindicated by the State Board. That's highly prejudicial.

Court: I don't think enough was said to go that far.

Zevan: I absolutely disagree.

Court: Motion for mistrial is denied. Your objection, for various reasons, one of which is hearsay, and the other one you're saying, relevancy.

Zevan: Yes.

Court: Are sustained. Go to something else.

---

4. Prior to this exchange, earlier in her direct testimony, Keisler testified that she had never been disciplined by the Board.

Although the court indicated that it did not think it necessary, at Snellen's request, the court further instructed the jury to "disregard the last question, and, if there was an answer, disregard it as well." Direct examination proceeded on a new topic.

At the next break Snellen's attorney's again addressed the court on the matter and again requested a mistrial and it was again denied.

After the jury's verdict, Snellen moved for a new trial, specifically raising this issue. Attached to the motion was an affidavit from Zevan. Zevan swore that he heard Sublett question Keisler as to whether the Board reviewed *this case.* Zevan swore that he witnessed Keisler respond to Sublett's question over objection and Keisler "responded that the Board had investigated her in this case and that she had been vindicated." Zevan swore that he witnessed Keisler's response "simultaneously as I was objecting to Ms. Sublett's question and walking toward the bench to address the objection...." He also swore that he "personally witnessed Juror No. 5, [name redacted], nodding his head up and down after Dr. Keisler gave her response." He stated also that because the comments were made simultaneously, Keisler's response was not recorded in the trial transcript.

At a post-trial hearing, the court heard argument regarding the motion for a new trial:

Zevan: First and foremost, we have the issue of Dr. Lydia Keisler. At the very end of her direct examination, before the jury, Dr. Keisler was asked whether or not there had been an investigation and whether or not she had been exonerated—or "vindicated" was the term, by the State Board of Healing Arts. Ms. Roman [sic] was doing the direct examina—the cross-examination [sic] of the witness at that time. When I heard those words coming into the courtroom, I objected. And as I objected, Dr. Keisler was turning to the jury and answered to them that she was investigated and exonerated by the State Board of Healing Arts.

The Court: Yeah, I'll just tell you, I didn't hear that.

Snellen argued that the oral withdrawal instruction which admonished the jury to disregard the question and any answer that may have been given was insufficient because the comment was too prejudicial.[5] Snellen also argued that the issue had been "rehearsed and planned" and that Keisler was intent on answering the question.

Capital Region's counsel argued that he did not hear "vindicated" or "exonerated" or "any words anywhere near close to anything like that." Capital Region's counsel pointed out that the record reflected that the question was whether this case had been investigated by the Board of Healing Arts and that the transcript indicated it was not answered.

After argument, the trial court stated:

The question here is what happened after the objection was made. And this Court was sitting right here, right next to this witness, and I—I stated, even—when we were at the bench, outside of the hearing of the jury, that I didn't hear a response about—to a subsequent issue of: "And the board decided she was vindicated."

Now, I even, on my admonishment, short of granting a mistrial, even had to qualify my admonishment to the jury as to any answer to the question, if there was one, because I didn't hear it. The record doesn't reflect it. While the

5. *See* M.A.I. 34.01 (7th ed.) regarding withdrawal instructions.

question was improper, the objection to it was sustained. The jury was hereafter told to disregard. There wasn't anything else to be disregarded, in this Court's view. And particularly since the record doesn't reflect it. Now—and I don't know if there's any more to be said on that. I don't think we need to get into whether or not the Board of Healing Arts is a peer review, because, there again, I think the objection was timely and proper and that this Court addressed the problem properly. So that point's overruled.

## Standard of Review

■■■ "A mistrial is a drastic remedy, granted only in extraordinary circumstances." *State ex rel. Kemper v. Vincent,* 191 S.W.3d 45, 49 (Mo. banc 2006) (citation omitted). "The trial court's decision to sustain or overrule a motion for a mistrial ... lies within its sound discretion." *In re Brasch,* 332 S.W.3d 115, 121 (Mo. banc 2011) (citing *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 778 (Mo. banc 1989)). "Absent a manifest abuse of discretion, an appellate court will not interfere with the trial court's decision." *Id.*

## Discussion

Snellen argues that counsel's affidavit should be given "the same weight as the trial transcript." Snellen asks us to determine that Keisler responded affirmatively to Sublett's question about the Board's review of this case and that Keisler further stated she was vindicated of all allegations. Snellen asserts reversible error, arguing that discussion of any such "vindication" is improper under section 537.035.4, relating to admissibility of matter from peer-review committees.[6] In essence, Snellen asks us to substitute the content of her attorney's affidavit in place of the trial transcript.

We note first that Snellen's request conflicts with Rule 81.15(d), which provides:

If there is any dispute concerning the completeness of the record on appeal, additional parts of the record on appeal may be filed pursuant to rule 81.12(c), or the record on appeal may be filed pursuant to rule 81.12(f). *If there is any dispute concerning the correctness of any legal file or transcript, the party disputing the correctness thereof shall designate in writing to the appellate court those portions of the legal file or transcript that are disputed.* Such designation shall be filed with the appel-

---

**6.** That provision states in part:

Except as otherwise provided in this section, the interviews, memoranda, proceedings, findings, deliberations, reports, and minutes of peer review committees, or the existence of the same, concerning the health care provided any patient are privileged and shall not be subject to discovery, subpoena, or other means of legal compulsion for their release to any person or entity or be admissible into evidence in any judicial or administrative action for failure to provide appropriate care. Except as otherwise provided in this section, no person who was in attendance at any peer review committee proceeding shall be permitted or required to disclose any information acquired in connection with or in the course of such proceeding, or to disclose any opin-

ion, recommendation, or evaluation of the committee or board, or any member thereof; provided, however, that information otherwise discoverable or admissible from original sources is not to be construed as immune from discovery or use in any proceeding merely because it was presented during proceedings before a peer review committee nor is a member, employee, or agent of such committee, or other person appearing before it, to be prevented from testifying as to matters within his personal knowledge and in accordance with the other provisions of this section, but such witness cannot be questioned about testimony or other proceedings before any health care review committee or board or about opinions formed as a result of such committee hearings.

late court within fifteen days after the legal file or the transcript, whichever is in dispute, is filed.... The appellate court shall direct the trial court to settle the dispute and to certify the correct contents of such portion to the appellate court, and such certification by the trial court shall become a part of the record on appeal.

(Emphasis added).

 Snellen made no motion under Rule 81.15(d). "An appellate court must accept the record as absolute verity; if the record does not reflect the facts, it should have been corrected in the trial court." *In re Wright*, 990 S.W.2d 703, 707 (Mo.App. S.D.1999). As in this case, "an appellate court cannot accept counsel's statements as a substitute for record proof, even though the court has no reason to doubt counsel's accuracy." *Id.* Even when the transcript is of "unusually poor quality," an appellate court "must take the transcript as we find it." *Kummer v. Cruz*, 752 S.W.2d 801, 809 (Mo.App. E.D.1988). "A transcript, duly approved, as here, is presumed to be correct." *Id. See also State v. Wolfe*, 344 S.W.3d 822, 841 (Mo. App. S.D.2011) (holding that where the transcript had been properly certified, "all other disputes about the correctness of the transcript were the responsibility of the trial court to settle"); *Linzenni v. Hoffman*, 937 S.W.2d 723, 725 (Mo. banc 1997) (citing *Kummer* and holding that, absent a timely challenge under Rule 81.15, a legal file duly certified or approved is presumed to be correct).

 The trial court had the full transcript available when it considered Snel-len's motion for a new trial. The transcript indicates that Sublett did improperly ask whether the Board had reviewed this case. The transcript also indicates that there was an immediate objection to the question and that the objection was sustained and the jury was instructed to disregard the question and any answer that may have been given. Taking the transcript as we find it, Keisler did not testify that she was "vindicated" by the Board. Rather, the record indicates that the question was interrupted by an objection and that no answer was given. At Snellen's request, the trial court directed the jury to disregard the last question and any answer. "The jury is presumed to follow the trial court's instructions." *State v. McFadden*, 369 S.W.3d 727, 752 (Mo. banc 2012) (citation omitted).

Snellen contends that she could not have complied with Rule 81.15(d) because she had already raised the accuracy of the transcript before the trial court to no avail. While that may be true, it does not change the requirement that, as a court of review, we must presume that the certified transcript is correct and it does not change our review of the denial of a mistrial for a manifest abuse of discretion as set out above. Snellen argues further that the withdrawal instruction was insufficient to overcome the effect of the prejudicial matter. Again, however, we do not reach the issue of prejudice because doing so would require us first to engage in a factual determination about the record, an act beyond our province.

Because we find no manifest abuse of discretion in denying a mistrial upon this record, this point is denied.[7]

---

7. We note that there was *absolutely* no reason for Capital Region's counsel to inquire as to whether the Board reviewed all claims of medical malpractice *or* whether this claim had been reviewed by the Board, except to improperly imply to the jury that the Board had determined that Keisler had committed no malpractice in this case. This is particu-larly true when earlier in the examination of the witness, counsel had inquired as to whether Keisler had ever had any disciplinary action taken against her license. This line of questioning was objectionable under section 537.035.4, which states that the findings and deliberations of peer-review committees are

## Point II: Admission of Expert Testimony

■ In her second point, Snellen argues that the trial court erred in overruling her objection to testimony from Dr. John Yeast ("Yeast"). Yeast was Capital Region's "standard of care" expert. At issue specifically is Yeast's trial testimony regarding a document entitled "Neonatal Encephalopathy and Cerebral Palsy," published in 2003 by the American College of Obstetricians and Gynecologists in connection with the American Academy of Pediatrics ("ACOG document").[8]

### Background

During his pre-trial deposition on August 23, 2010, Snellen's counsel asked Yeast about documentation, literature, or anything else aside from medical records and other deposition testimony that Yeast looked at prior to the deposition. Yeast testified that there were none. Snellen's counsel confirmed that the deposition notice asked for all documents Yeast *relied on* in testifying. Yeast replied: "I guess I would say that there could be other documents that would be used for exhibit preparation or something like that at the time of trial. I'm not sure what those are yet."

On cross-examination at the same deposition, Capital Region's counsel asked Yeast whether Yeast had provided to him "a document or report that was prepared by a consensus task force on cerebral palsy." Yeast replied that he had, and he described the ACOG document. Snellen's counsel then asked: "So you won't be relying on it at trial?" At that point, Capital Region's counsel interjected: "He may be relying upon it at trial. That's what I'm telling you." In response to a follow-up question from Snellen's counsel, Yeast stated: "I did not review that document as part of my review of the records, but that is one piece of information that we did discuss and I did share with [Capital Region's counsel], because I was aware of it."

On April 12, 2011, Capital Region's counsel sent Snellen's counsel a letter in its entirety stating:

I am enclosing a copy of the ACOG documents referred to in your deposition of Dr. Yeast. We can argue about the semantics of whether he 'relied upon it' in giving his opinions in this case. Regardless, we, in the defense of our clients, may reference and exhibit portions of it during the trial of this matter for the purpose of illustrating Dr. Yeast's and other defense experts' opinions as well as potentially using it with other witnesses in the case. Exactly how it might be used is unknown but I wanted to give you plenty of notice that we may use it in some fashion during trial.[9]

---

not subject to discovery, subpoena, or other means of legal compulsion, nor are they "admissible into evidence in any judicial ... action for failure to provide appropriate care." *See State ex rel. Faith Hosp. v. Enright*, 706 S.W.2d 852, 856 (Mo. banc 1986) (holding that production of peer review committee reports, to the extent they address the health care provided to any patient, are immune from discovery). Further, the findings of the Board are irrelevant to the issues in a medical malpractice trial as the burden of proof and the issues to be decided are completely different. Capital Region does not contest that this information was inadmissible. Had the trial court granted a mistrial based upon the injec-

tion of this issue into the trial by the defendants, we would affirm that proper use of the trial court's discretion as well.

8. Throughout the record and briefs, this document is referred to in many ways, e.g., as "ACOG" documents, "Compendium," "monograph," and "task force" guidelines. Parts of these documents are included in the record on appeal. For consistency, we will refer to them as "ACOG document" in this opinion.

9. Capital Region argues that this letter was sufficient to comply with its duty to supplement the pre-trial deposition testimony of Dr. Yeast. *See Bradford v. BJC. Corp.*, 200 S.W.3d 173, 180 (Mo.App. E.D.2006).

At trial, there was testimony by three experts regarding the ACOG document and it was admitted into evidence in its entirety, without objection, before Yeast testified. First, Dr. Patricia Robertson ("Robertson"), Snellen's "standard of care" expert, was cross-examined without objection about whether she disagreed with the four criteria contained in the ACOG document. Robertson testified that she disagreed with the criteria but acknowledged that the report was put out by the American College of Obstetricians and Gynecologists.

Second, Snellen's pediatric neurologist, Dr. Nitin Patel ("Patel") testified on cross-examination without objection that the ACOG document was authoritative. An excerpt from the ACOG document was introduced into evidence during Patel's testimony.

Third, Capital Region's expert, Dr. Elias Chalhub ("Chalhub"), a pediatric neurologist, testified without objection about the ACOG document and whether the criteria therein had been met in this case. Over Snellen's objection, an excerpt from the ACOG document was admitted into evidence. Chalhub's testimony established that Snellen's neurological damages to a reasonable degree of medical certainty were not related to labor and delivery and that although there is no identifiable cause, Snellen's injuries are consistent with a perinatal problem, perhaps with the placenta. On cross-examination, Snellen also questioned Chalhub about the ACOG document. *Snellen then offered into evidence the entire ACOG document.*

Yeast testified after all of these witnesses and the document was already in evidence. Snellen objected to Capital Region questioning Yeast about the ACOG document because it was "unfair" and "surprise" in that Yeast did not say in his deposition he was relying on it in forming his opinion that Snellen could not have suffered an HIE. Based on Capital Region's above-referenced letter to Snellen indicating that Yeast might testify regarding the ACOG document, Snellen's objection was overruled.

At trial, Yeast summarized the ACOG document as helping "determine whether certain conditions that a baby might experience were related to events that happened at the time of labor and delivery and to come up with guidelines ... that ... based on looking at all literature and all the evidence, would support or refute that an injury was related to inadequate oxygen during that time period." Over Snellen's objection, Yeast testified that per the ACOG document, there must be evidence of four essential criteria "to suggest that a neurologic injury was a result of what happened during the labor and delivery time period." He then testified that not all four criteria were met in Snellen's case.

### Standard of Review

A trial court's decision regarding admissibility of evidence is reviewed for an abuse of discretion. *Howard v. City of Kansas City,* 332 S.W.3d 772, 786 (Mo. banc 2011). "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Klotz v. St. Anthony's Med. Ctr.,* 311 S.W.3d 752, 760 (Mo. banc 2010) (citation omitted). "We defer to the trial court's determination of admissibility because 'it is in a superior position to evaluate the proffered evidence in the context of the trial.'" *Beaty v. St. Luke's Hosp. of Kansas City,* 298 S.W.3d 554, 558 (Mo.App. W.D.2009) (citation omitted). To reverse the trial court's determination, we must find that Snellen was prejudiced be-

cause the inclusion or exclusion of evidence materially affected the merits of her action. *Id.*

## Discussion

In arguing that Yeast's use of and reliance on the ACOG document to support his opinion at trial was improper and prejudicial, Snellen relies on *Gassen v. Woy*, 785 S.W.2d 601, 604 (Mo.App. W.D.1990). In that opinion, we concluded that

> the rules and the case law establish a principle that when an expert witness has been deposed and he later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition.

*Id.*

Snellen's argument that the trial court abused its discretion in permitting such testimony because during the deposition her counsel obtained "unequivocal testimony" that Yeast "would not be relying upon literature to support his opinions" must fail. First, Snellen points to no opinion of Yeast's that changed between the deposition and his trial testimony, only that Yeast used the ACOG document to explain his earlier opinions. Further, given Yeast's comment during deposition that "there could be other documents that would be used for exhibit preparation or something like that at the time of trial," the deposition transcript does not support Snellen's broad characterization of Yeast's "unequivocal testimony" on the matter. Also, later in the same deposition, Capital Region specifically brought up the ACOG document and informed Snellen that Yeast might use that document at trial. Yeast further qualified his earlier statement by adding that the ACOG document was "one

piece of information that we did discuss and I did share with [Capital Region's counsel], because I was aware of it."

██ Moreover, Capital Region informed Snellen by way of a letter *more than a year before trial* that Yeast and other witnesses may testify regarding the ACOG document. While the content of this letter would have been insufficient to supplement a change in the expert's opinion from the deposition, as it did not provide the necessary detail to clearly inform the opposing party of exactly which opinions had changed and exactly what the new opinions were, it did put Snellen on notice of the expert's intent to rely on the documents to explain his opinions. "[D]iscovery rules and case law establish principle that when an expert witness has been deposed and later changes his opinion before trial or bases that opinion on new or different facts from those disclosed in the deposition, it is the duty of the party intending to use the expert witness to disclose that new information to his adversary, thereby updating the responses made in the deposition." *Redel v. Capital Region Med. Ctr.*, 165 S.W.3d 168, 175 (Mo. App. E.D.2005) (citing *Gassen*, 785 S.W.2d at 604). Snellen thus had plenty of notice that Yeast might rely on those documents. Finally, given that our review is for abuse of discretion and that a party must establish prejudice, we note too that Snellen herself asked that the entirety of the ACOG document be admitted into evidence before Yeast testified, that other experts relied on the ACOG document in rendering an opinion, and that Snellen does not establish that Yeast's testimony materially changed or affected the merits of her action.

██ Snellen further makes a collateral argument regarding the admissibility of the ACOG document because it was prepared in 2003 and the question before the

jury was the standard of care in 1998, the date of Snellen's birth. While this may be a proper statement of the law, Snellen cites no authority whatsoever to support this argument. "An appellant has an obligation to cite appropriate and available precedent if he expects to prevail, and, if no authority is available to cite, he should explain the reason for the absence of citations." *M.H. v. Garcia*, 385 S.W.3d 489, 490 (Mo.App. W.D.2012) (citation omitted). "When an appellant fails to cite relevant law and explain how it applies to the applicable facts, we deem the point abandoned." *Id.*

*Ex gratia* we note that the jury instruction informs the jury that medical negligence is "the failure to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of defendant's profession." MAI 11.06; *see also Ladish v. Gordon*, 879 S.W.2d 623, 628 (Mo.App. W.D.1994). In order to establish the standard of care under the "same or similar circumstances" it needs to be the *standard of care* of that profession at the time that the malpractice was alleged to have occurred. If a new procedure is developed after the alleged malpractice that was unknown at the time that would have avoided the injury to the patient, it is inadmissible to show the standard of care at the time of the relevant events. However, evidence of *causation* is not so limited to the timeframe of the alleged malpractice. If the cause of the injury is difficult or impossible to ascertain at the time of the alleged malpractice, but a later scientific breakthrough allows that determination to be made, the new causation evidence is relevant and admissible.

In this case, the testimony regarding the ACOG document concerned whether the alleged negligent actions of Keisler *caused* Snellen's cerebral palsy, not whether Keisler's actions fell below the *standard of care*. Further, Snellen herself placed the

documents in evidence. *See Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 953 (Mo.App. S.D.1985) (holding that "[i]t is only reasonable that having expressly consented to an item being admitted in evidence, there is no standing to complain later about the matter, in whole or in part"). Finally, Snellen points to no prejudice by the admission of this testimony with the exception that her cross examination at trial would have been drastically different had the expert acknowledged at his deposition that he would use the documents to support his opinions at trial.

This point is denied.

## Point III: Motion for a Withdrawal Instruction

In her third point on appeal, Snellen argues that the trial court erred in denying her motion for a withdrawal instruction ordering the jury to disregard the entire testimony of Dr. Carolyn Salafia ("Salafia") because that testimony offered no assistance to the jury and her opinions were not based on a reasonable degree of medical certainty as to the cause of Snellen's neurological defects. She argues that Salafia's "unsupported and generic testimony about some general correlation between damaged placental blood vessels and neurological impairment had no purpose other than to confuse the jury about whether the small damaged vessels she found in the placenta had some bearing or effect on [Snellen's] injuries."

### Background

The issue of the health of the placenta arose during Snellen's case-in-chief. One of Snellen's witnesses, Dr. Sandra E. Reznik ("Reznik"), is a placental pathologist not affiliated with Capital Region. *She testified that her study of the placenta that nourished Snellen indicated to a reasonable degree of medical certainty*

*that the placenta was not abnormal in any way.* She also testified that, to a reasonable degree of medical certainty, less than one percent of the villi (tiny blood vessels in the placenta) were damaged, as is normal, and that this amount of loss would not impact the ability of the placenta to function properly.[10]

Reznik also testified that she would not expect to find in the placenta evidence of injury to a fetus that occurred via lack of oxygen or blood flow at or near the time of delivery because "there isn't enough time for changes to develop in the placental tissue." Reznik acknowledged on cross-examination that if there is a problem with blood flow in a baby's placenta, it can cause ischemic injury. She also testified that she had identified "old blood" in the placenta and further that from McCormick's medical records, she associated the "old blood" with bleeding in the first trimester and unrelated to placental abnormality.

Like Reznik, Salafia is a placental pathologist not affiliated with Capital Region.[11] She was Capital Region's expert on placental pathology. Salafia testified that there was damage to blood vessels in the placenta. Specifically, *Salafia testified that there was a placental abnormality:* "In my opinion, and to a reasonable degree of medical certainty, vessels were damaged here and some dropped out, some were obliterated, but others were able to repair, and this villus was able to continue to serve this baby to some extent as a functioning unit." Salafia also testified that the evidence in this case is that the injuries in the placenta occurred at least 24 to 48 hours or perhaps five to seven days before delivery.

Salafia also testified that literature indicates that there is a general correlation between damage to blood vessels in the placenta and neurological impairment, but she did not opine that this was true in this case as such an opinion was outside of her field of expertise. On at least one occasion, Capital Region asked Salafia about this correlation and Snellen failed to object. As noted above, Chalhub testified that Snellen's neurological damages, to a reasonable degree of medical certainty, were not related to labor and delivery and that although there is no identifiable cause, Snellen's injuries are consistent with a perinatal problem, perhaps with the placenta.

After cross-examination and after Salafia had been excused, Snellen's counsel requested that the trial court instruct the jury to disregard Salafia's entire testimony on the basis that she offered no opinion based on a reasonable degree of medical certainty relevant to any issue in the case and that her testimony would merely confuse the jury. The trial court denied that request.

**Preservation and Standard of Review**

Salafia was deposed prior to trial. As Snellen recognized in her second point on appeal, when an expert witness has been deposed, it is the duty of the party intending to use the expert witness to disclose any new information to his adversary, thereby updating the responses made in the deposition. *Gassen,* 785 S.W.2d at 604. Snellen does not argue that she was not fully aware of the content of Salafia's testi-

---

10. The testimony established that the placenta provides oxygen and nutrition to the fetus and that certain types of damage to the placenta can impact its ability to provide those functions, which can be an alternate cause of cerebral palsy.

11. Reznik and Salafia are experts from the New York City area. Reznik testified that Salafia trained and mentored Reznik in 1997–98.

mony prior to trial. However, Snellen points to no part of the record where she made a pre-trial motion to exclude Salafia's testimony on the basis of relevancy, jury confusion, foundation, or any other ground. *See Elliott v. State,* 215 S.W.3d 88, 92 (Mo. banc 2007) (holding challenges to exclusion of expert testimony during civil commitment proceeding were properly preserved where defense counsel filed pre-trial motion, renewed the motion before opening statements, which was treated as a continuing objection, and renewed objection during expert's testimony).

■ More importantly, Snellen did not object to Salafia's testimony that the placenta was abnormal, and she did not object to Salafia testifying that there is literature correlating damage to the blood vessels in the placenta with neurological impairment. Put another way, although Snellen complains now that it was error to admit Salafia's testimony about the placental health and about the statistical correlation, she did not properly object at trial. Rather, Snellen waited until Salafia had been excused and left the stand and then attacked her testimony. Such failure to object preserves nothing for review. *In re Spencer,* 171 S.W.3d 813, 820 (Mo.App. S.D.2005) (holding that although counsel filed pretrial motion to exclude expert testimony, counsel did not object during expert testimony and therefore preserved nothing for review); *McGinnis v. Northland Ready Mix, Inc.,* 344 S.W.3d 804, 815 (Mo.App. W.D.2011). "Where a motion to strike testimony is made after the witness is excused, the trial court will not be convicted of error in denying the motion." *Id.* (quoting *State v. Bedell,* 890 S.W.2d 702, 705 (Mo.App. S.D.1995)).

■ We have the discretion to review unpreserved claims for plain error, but plain-error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections. *Sasnett v. Jons,* 400 S.W.3d 429, 437 (Mo.App. W.D.2013) (citation omitted). "We will reverse for plain error in civil cases only in those situations when the injustice of the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Id.* at 437–38 (citation omitted).

Because this error is not properly preserved and because we see no manifest injustice or miscarriage of justice, this point is denied.

## Point IV: Voir Dire

■ In her fourth point on appeal, Snellen argues that the trial court plainly erred during voir dire in making prejudicial comments before the entire venire panel, including, "Waah. Mama. Starving." and "accompanying gesticulations" in conjunction with a breastfeeding member of the venire panel and stating "I couldn't take the guilt. These attorneys probably could but I couldn't," before he excused her for hardship. Snellen argues that the trial judge improperly asked counsel in front of the venire panel if either had an objection to excusing that venire person because such conduct was highly prejudicial to Snellen in that it minimized the serious tone of the case and forced Snellen's counsel to agree to the dismissal of a potentially favorable juror.

### Background

During voir dire, the following exchange occurred:

VENIREPERSON 12: And I know I mentioned this before, but I would need several breaks, since I am nursing my daughter. Every three to four hours probably.

COURT: Now that I don't have.

VENIREPERSON 12: I didn't think I'd mentioned that. I didn't know if that

was clear, and that would be a problem for me.

COURT: You have to nurse how frequently?

VENIREPERSON 12: I would have to pump. Which is probably every three to four hours.

COURT: Okay. So we're probably coming up on that right now?

VENIREPERSON 12: Getting close. But, I mean, I can hold off until lunch break if I need to.

COURT: "Waah. Mama. Starving." Do we have agreement, Counsel?

CAPITAL REGION: I have no objection to you letting her go, Your Honor.

SNELLEN: No, Your Honor.

COURT: Number 12, you may—

SNELLEN: Since you phrased it that way.

COURT: I couldn't take—I couldn't take the guilt. These attorneys probably could, but I couldn't.

Number 12, thanks for coming in. You're excused. Okay?

(Venireperson 12 excused.)

COURT: Number 12 excused by agreement.

**Preservation and Standard of Review**

To the extent that this point is directed at the comments of the trial judge in mimicking a crying child and his comments before the entire venire panel, there was no objection and therefore it is subject to plain error review. As noted above, we have the discretion to review unpreserved claims for plain error, but plain-error review is rarely applied in civil cases, and may not be invoked to cure the mere failure to make proper and timely objections. *Sasnett*, 400 S.W.3d at 437. "We will reverse for plain error in civil cases only in those situations when the injustice of the error is so egregious as to weaken the very foundation of the process and seriously

undermine confidence in the outcome of the case." *Id.* at 437–38 (citation omitted). To the extent that this point is directed at the fact that this venireperson was improperly excused from jury service, review by this court has been waived by the affirmative representation by Snellen that there was no objection to her being excused. The affirmative representation that a party has "no objection" to evidence or instructions waives all review, including plain-error review. *Atkinson v. Corson,* 289 S.W.3d 269, 277 n. 6 (Mo.App. W.D. 2009) (citations omitted). We hold that this same standard applies to the striking of a venire person. Further, when a juror is excused and does not participate in the deliberations, there is no error. A party has no right to a particular juror or jury composition. *See State v. West,* 866 S.W.2d 150, 154 (Mo.App. E.D.1993) (citations omitted).

**Discussion**

We do not condone the actions of the trial judge in this aspect of the trial. This juror did not request to be excused for hardship; she merely informed the trial court of a need for a break every three to four hours so she could pump breast milk. Such limitation is not itself disqualifying. *See* § 494.425. It would be truly rare indeed for any trial to go on for more than three hours without at least one juror, the court staff or the court needing to take a break for some purpose. The trial court did not inquire of the venireperson whether she wished to be excused or whether either party wished to have her excused; instead, he took it upon himself to excuse her and in doing so brought inappropriate attention to her personal condition in a way that may have been embarrassing or stressful to her.

"A judge presiding at trial should maintain an impartial attitude in conduct and demeanor, and should exercise a high

degree of patience and forbearance with counsel and witnesses." *Hawkins v. Compo,* 781 S.W.2d 128, 131 (Mo.App. W.D. 1989). At the same time, however, "[t]rial judges are not stone statues." *State v. Hudson,* 950 S.W.2d 543, 548 (Mo.App. W.D.1997). And if we were to undertake review, here it would be for "error [ ] so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." *Sasnett,* 400 S.W.3d at 437–38.

As noted above, Snellen not only failed to object to the comment, "Waah. Mama. Starving.", she also agreed that the juror should be excused. Even taking the comment as harmful to Snellen, we see nothing in the record indicating that the judge's comment was motivated by the nature of the case, a medical malpractice action involving childbirth. In sum, the record does not indicate reversible error under our standard of review.

In support of her argument, Snellen relies on *Parodi v. Washoe Medical Center Inc.,* a Nevada case where the trial judge "minified the seriousness of [the] wrongful death action and engendered an inappropriate trial atmosphere and prejudiced their right to a fair trial." 111 Nev. 365, 892 P.2d 588, 589 (1995). In that case, the trial judge made several joking comments and led the jurors in a standing ovation when counsel was late from recess. Those facts and that type of error are simply not present in this case.

This point is denied.

### CONCLUSION

The judgment of the trial court is affirmed.

All concur.